IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

AARON P., and PUAKIELENANI P. )   CIVIL NO. 10-00574 LEK-KSC
in their capacity as Parents  )
and legal guardians of The    )
Student K.,                   )
                              )
          Plaintiffs,         )
                              )
     vs.                      )
                              )
DEPARTMENT OF EDUCATION,       )
STATE OF HAWAII,              )
                              )
          Defendants.          )
_____ )


**ORDER AFFIRMING IN PART AND REMANDING IN PART
THE HEARINGS OFFICER'S SEPTEMBER 3, 2010 DECISION**

          Before the Court is an appeal by Plaintiffs Aaron P.

and Puakielenani P.,[1] in their capacity as parents and legal

guardians of Student K. (collectively "Plaintiffs"), of the

Administrative Hearings Officer's ("Hearings Officer") Findings

of Fact, Conclusions of Law and Decision ("Decision"), filed on

September 3, 2010.  Plaintiffs filed their Opening Brief in the

instant case on March 22, 2011.  Defendant the Department of

Education, State of Hawai`i ("the DOE" or "Defendant") filed its

Answering Brief on May 17, 2011, and Plaintiffs filed their Reply

Brief on May 31, 2011.  The Court heard oral argument in this

matter on June 27, 2011.  Appearing on behalf of Plaintiffs was

_____

          [1] The Court will refer to Aaron P. as "Father" and
Puakielenani P. as "Mother", and to Father and Mother
collectively as "Parents".

Magali Sunderland, Esq., and appearing on behalf of Defendant was Michelle Puu, Esq.   Pursuant to this Court's order, the parties submitted supplemental briefing after the hearing.   Plaintiffs filed their supplemental memorandum on August 10, 2011; Defendant filed its supplemental memorandum on August 17, 2011; and Plaintiffs filed their supplemental reply brief on August 24, 2011.   After careful consideration of the parties' submissions, the arguments of counsel, and the relevant legal authority, the Decision is HEREBY AFFIRMED IN PART AND REMANDED IN PART because, although the Court agrees with the Hearings Officer's rulings on Plaintiffs' claims based on evaluation and on the four individualized educational program ("IEPs") specifically addressed in the Decision, the Court must remand the case so that the Hearings Officer can address Plaintiffs' claims based on the other IEPs and Prior Written Notices ("PWN") that Plaintiffs challenged in their Request for Impartial Hearing ("RIH"), but which the Hearings Officer did not specifically rule upon in the Decision.

## BACKGROUND

### I.   Factual and Administrative Background

At the time of the Decision, Student K. (or "Student") was almost seven years old.   The Decision addresses her prior attendance at Kamali`i Elementary School ("Kamali`i") and her

private placement at the Pacific Autism Center ("PAC").[2]  In 2004, Student K. began an early intervention services program on O`ahu after undergoing a Department of Health ("DOH") evaluation prior to her first birthday.  Her pediatrician diagnosed her with developmental delay and low muscle tone.  Student K.'s family moved to Maui in 2005, and Student K. continued her early intervention services through IMUA Family Services ("IMUA"). Student K. entered the DOE system in the 2006-2007 school year. She was found eligible for special education services and the related services of occupational therapy and speech language therapy in the category of developmental delay (ages 3-5). [Decision at 6.[3]]

Plaintiffs obtained private psychological examinations of Student K. on October 13, 2006 and January 30, 2007. Ellen Caringer, Ph.D., diagnosed Student K. with Pervasive Developmental Disorder - Not Otherwise Specified ("PDD-NOS"), which is an autism spectrum disorder ("ASD"), and Moderate Mental Retardation ("MMR").  [Id. at 2, 6.]  Dr. Caringer recommended that Student K. receive: "(a) maximum levels of speech therapy; use of other communication mechanisms; (b) use of a 1:1 aide; (c)

––––––––––––––––

[2] Student K. attended PAC from August 3, 2009 to June 30, 2010.  As of the filing of the Complaint, she was attending Ahuiamanu Elementary School in Kāne`ohe, Hawai`i.  [Complaint at ¶¶ 31-32.]

[3] The Decision is in the Administrative Record on Appeal ("ROA") at 000150-74.

3

consultation with an autism specialist to develop the IEP; and (d) occupational therapy and physical therapy consultation and intervention . . . ."  [Id. at 6.]  Also in the first half of 2007, Plaintiffs obtained private occupational therapy and physical therapy evaluations.  [Id. at 7.]

In the 2007-2008 school year, Student K. attended pre-school at Kamali`i in a fully self-contained special education ("SPED") classroom.  She received 120 minutes per quarter of occupational therapy, sixty minutes per week of speech language therapy, physical therapy consultation services, one-on-one adult support, the services of a Behavior Intervention Services Specialist ("BISS"), and the services of an Autism Consulting Teacher ("ACT").  There were four IEP meetings during that school year: August 10, 2007, November 2, 2007, February 14, 2008, and April 8, 2008.  [Id. at 8.]

In the 2008-2009 school year, Student K. continued pre-school at Kamali`i, with almost the same services and supports that she received the previous year, except that the amount of occupational therapy she received varied during the year, and she also received an Extended School Day ("ESD") program at home with one-on-one adult support.  IEP meetings convened on the following dates for the 2008-2009 school year: July 29, 2008; August 1, 2008; August 22, 2008; September 8, 2008; September 22, 2008; November 24, 2008; December 9, 2008; May 11, 2009; May 18, 2009;

and June 23, 2009.  [Id. at 9-10.]

On November 25, 2008, Plaintiffs obtained a private physical therapy evaluation.  Carol Riccio, M.S., P.T., recommended that Student K. receive physical therapy.  [Id. at 11; ROA, Pets.' Exh. 36 (evaluation dated 11/25/08).]  On December 3, 2008, Plaintiffs obtained a comprehensive psychological evaluation of Student K. from the Resnick Neuropsychiatric Hospital Autism Evaluation Clinic at the University of California Los Angeles ("UCLA Evaluation").  [Decision at 11; ROA, Pets.' Exh. 35 (UCLA Evaluation).]  On March 26-27, 2009, Plaintiffs obtained a private psychological consultation.  Colin B. Denney, Ph.D., diagnosed Student K. with Autistic Disorder and MMR and made various recommendations.  [Decision at 2, 11-12; ROA, Pets.' Exh. 62 (evaluation dated 3/26-3/27/09).]

At the May 18, 2009 IEP team meeting, the team had its first opportunity to review the UCLA Evaluation.  [Decision at 11 n.15, 12.]  The IEP team agreed that the DOE would conduct speech, cognitive, and physical therapy assessments of Student K.  The DOE completed the three assessments during the month of July 2009.  [Id. at 12.]  The Hearings Officer noted that the DOE had been attempting to conduct a physical therapy evaluation of Student K. since November 2008, but Plaintiffs did not consent to the evaluation until sometime after May 18, 2009 because they did

not believe that the DOE could provide an unbiased evaluation. [Id. at 12 n.16.]

On July 2, 2009, Student K.'s eligibility team met and determined that she remained eligible for IDEA services under the category of multiple disability - autism.  [Id. at 12.]

Plaintiffs removed Student K. from Kamali`i after the 2008-2009 school year and placed her at PAC, a facility on Oahu for children with ASDs.  [Id. at 17.]

On July 15, 2009, Plaintiffs filed the RIH with the Office of Administrative Hearings, Department of Commerce and Consumer Affairs.  The RIH argues that:

> For the school years 2007-08 and 2008-09 [Student K.'s] IEPs have not provide (sic) appropriate services or placement for her.  Her goals and objectives have not been adequate or appropriate to address her deficits, nor have her needs been adequately identified.  Moreover, the DOE has failed to provide all services as stated in [Student K.'s] IEP for the above stated school years.  Due to the DOE's failure to offer a [free appropriate public education ("FAPE")] for the past two years, and for the 2009-10 school year, [Plaintiffs] will be relocating to the island of Oahu and will be placing [Student K.] at the Pacific Autism Center. . . .

[ROA at 5.]  The RIH sought:

> a).  A finding that the IEPs, including the IEPs of April 8, 2008, September 8, 2008, May 18, 2009 and June 23, 2009, violate the IDEA and have not offered FAPE to [Student K.] for the past two years, and for the 2009-10 school year;
>
> b).  A finding that the DOE committed procedural and substantive violations of the IDEA,

including but not limited to failing to
properly evaluate [Student K.], failing to
develop appropriate goals and objectives,
failing to offer appropriate services or
programs to meet her unique needs, and/or
failing to implement [Student K.'s] IEPs;

c).  Reimbursement to [Plaintiffs] for school
tuition, services and related expenses
(including travel related expenses) paid to
the Pacific Autism Center, and/or payment of
school, services tuition and related expenses
at the Pacific Autism Center from August 3,
2009 (including travel related expenses),
pursuant to 20 U.S.C. § 1412(a)(10)(C);

d).  An assessment needs to be conducted to
determine [Student K.'s] educational needs
with respect to communication.

e).  An academic assessment needs to be completed
to determine [Student K.'s] current academic
strengths and weaknesses as well as where she
is with respect to academic standards.

f).  A behavioral intervention plan needs to be
developed and implemented;

g).  [Student K.] needs an increase in her direct
speech therapy services;

h).  [Student K.] needs direct occupational
therapy and/or physical therapy service)
(sic);

i).  [Student K.] needs intensive autism-specific
education/training, including the use of
ABA/Verbal Behavior,[4] both in the classroom
and in the home setting, provided by skilled
and knowledgeable therapists;

j).  Reimbursement to [Plaintiffs] for the cost of
private evaluation conducted by the UCLA
Medical Center, Kiegan Blake (OT), Carol
Riccio, RPT, and Colin Denney, Ph.D.;

---

[4] "ABA" refers to Applied Behavioral Analysis.

k).   Compensatory education;

l).   Attorney's fees and costs.

[ROA at 6.]

After various continuances, the due process hearing
convened on February 10 and 11, 2010, March 23, 2010, and May 5
and 6, 2010.  [Decision at 3-5.]  The parties submitted written
closing briefs and proposed findings of fact and conclusions of
law.  The Hearings Officer filed the Decision on September 3,
2010, due in part to her unexpected medical leave.  [Id. at 5.]

In the Decision, the Hearings Officer framed the issue
in the RIH as whether the IEP drafted at the April 8, 2008
meeting ("4/8/08 IEP"), the IEP drafted at the September 8, 2008
meeting ("9/8/08 IEP"), the IEP drafted at the May 18, 2009
("5/18/08 IEP"), and the IEP drafted at the June 23, 2009 meeting
("6/23/09 IEP") offered Student K. a FAPE.  [Id.]

The Decision summarized Student K.'s history of private
and DOE evaluations and IDEA services from the time she entered
the DOE system through the period at issue in the RIH.  [Id. at
6-17.]  The Hearings Officer found, *inter alia*:

> 45.  When the DOE [Speech Language
> Pathologist] first began working with Student in
> Fall 2006, Student had a difficult time sitting at
> a table and attending to her speech sessions.
> Student had no interest in objects, no appropriate
> play skills and did not engage in any social
> interaction.  During the 2007-2008 school year,
> Student did not verbalize or initiate requests of
> any time (sic).  Student used sign approximations
> (approximations of American Sign Language signs)

8

and the Picture Exchange Communication System ("PECS"). Student required a reliable mode of communication that would be understood by a majority of people. PECS was determined to be the most appropriate method of communication for Student.

46. During the 2008-2009 school year, . . . Student needed to be prompted to use her PECS book. At the end of the year, Student was consistent in using her PECS book to request things and used approximately 100 PECS icons/photos to communicate.

47. Student made educational progress on her speech and communication goals.

. . . .

50. Student made educational progress on her occupational therapy goals and objectives.

. . . .

52. According to the DOE [Physical Therapist], Student was able to access her class room and the school environment, including the play ground and school field. Student could ambulate and navigate the school campus and carry her educational materials from class to class. As such, Student did not require direct physical therapy services.

. . . .

54. The DOE SPED Teacher worked with Student from the 2006-2007 school year to and including the 2008-2009 school year. He testified that during the 2007-2008 and the 2008-2009 school years, Student had an intense, highly structured education program that was specifically designed for her individual needs.

. . . .

56. Student's educational program, an intensive program based extensively on ABA principles, was provided to her five days a week from 8:15 a.m. to 2:45 p.m. (2:00 p.m. on Wednesdays) and from 3:45 p.m. to 5:30 p.m., in the class room, recess, the cafeteria/lunch time, at home and in the community.

57. Student's IEPs were developed with information and input from Student's teachers, related service providers, Parents, data collected for Student, and assessments and evaluations conducted by [the DOE], and assessments evaluations (sic) from private providers shared by

9

Parents, quarterly reports submitted by the BISS, observations, IEP and other progress reports, and classroom work.

[Id. at 13-15 (citations omitted).]  Ultimately, the Hearings

Officer found that,

69.  Student's placement, special education pre-school program with pull-outs for 1:1 teaching for discrete trial training [("DTT")], speech, occupational therapy and sensory regulation, was required to ensure she was provided with appropriate opportunities for learning.  Student's placement was in the least restrictive environment and allowed her to learn and benefit from her IEP goals and objectives.  Student was provided the opportunity to interact with special education peers and typical peers in various school settings.

[Id. at 17.]

In her conclusions of law, the Hearings Officer divided

the issues that Plaintiffs raised into two categories -

evaluation, and program/placement.  As to evaluation, Plaintiffs

contended that the DOE failed to consider the private evaluations

that Plaintiffs provided and that the DOE failed to complete the

evaluations agreed upon during the May 18, 2009 IEP team meeting

in a timely manner.  [Id. at 19.]  After reviewing the

recommendations and observations of the private providers as

compared to those of DOE personnel, [Id. at 19-22,] the Hearings

Officer concluded that the related services that the DOE offered

to Student K. during the 2007-2008 and the 2008-2009 school years

"addressed her unique needs and provided her with adequate

support services to take advantage of educational opportunities."

[Id. at 22.]  The Hearings Officer also concluded that the DOE completed the agreed upon evaluations in a timely manner once Plaintiffs provided their consent to the evaluations.  [Id.]

As to program and placement, Plaintiffs contended that: the DOE failed to offer Student K. an appropriate, autism-specific program or services, including ABA; the DOE special education pre-school setting could not meet Student K.'s needs, even with accommodations; Student K. needed direct physical therapy services, and additional occupational therapy and speech language therapy services; Student K.'s IEPs did not have either adequate identifications of her needs or appropriate goals and objectives; and the services called for in Student K.'s IEPs were not fully implemented.  [Id. at 19.]  The Hearings Officer concluded that the IEPs adequately identified Student K.'s strengths and needs and that the goals and objectives in the IEPs were appropriate and were reasonably calculated to enable her to receive educational benefit.  [Id. at 22-24.]  As to Plaintiffs' claim that the DOE failed to provide some of the services called for in Student K.'s IEPs, the Hearings Officer concluded that Plaintiffs did not provide sufficient evidence to prove that Student K. was denied the agreed upon parent education services or that she received less than the specified number of occupational therapy minutes.  [Id. at 24.]  The Hearings Officer also concluded that the challenged IEPs provided Student K. with

an autism-specific program, including related and consultative
services appropriate to her needs, that was reasonably calculated
to allow her to receive educational benefit.  [Id. at 25-26.]

        The Hearings Officer therefore concluded that
Plaintiffs failed to prove that the challenged IEPs denied
Student K. a FAPE because the placement offered in the challenged
IEPs "was offered in the least restrictive environment and
appropriate for her unique needs."  [Id. at 26-27.]  The Hearings
Officer dismissed the RIH and found the DOE to be the prevailing
party.  [Id. at 27.]

        The instant action followed.

## II.  Plaintiffs' Opening Brief

        Plaintiffs' first major argument is that the DOE did
not perform a comprehensive evaluation of Student K.'s suspected
autism until shortly before her private placement, and therefore
Student K.'s program could not adequately address her needs and
did not enable her to make any meaningful progress.
Specifically, Plaintiffs argue that: 1) the Hearings Officer
over-simplified the issues presented in the RIH; 2) the Hearings
Officer committed reversible error in failing to acknowledge
Student K.'s educational history beyond the statute of
limitations period; 3) the Hearings Officer erred in
characterizing Student K.'s self-injurious behaviors ("SIBS") as
emerging communication attempts; 4) the DOE's failure to evaluate

Student K.'s autism constituted a procedural denial of a FAPE; 5) the DOE failed to provide Student K. a "basic floor" because her IEPs resulted in minimal academic and functional progress; 6) the contested IEPs denied Student K. a FAPE because her providers were not trained in ABA techniques, the DOE failed to implement various aspects of the contested IEPs, and Student K. was incapable of following the regular pre-school program at Kamali`i because of her lack of communication and other skills; and 7) Plaintiffs are entitled to reimbursement for their expenses at PAC because PAC was the least restrictive environment available for Student K.

Plaintiffs argue that the Court should not accord deference to the Decision because, "although it is prolix and contains a plethora of information," the Hearings Officer did not cite the facts that she relied upon in reaching her conclusions of law and her findings of fact were not supported by the record. [Opening Br. at 32-33.]

### A.  **Alleged Factual Errors and Limitation of the Issues**

Plaintiffs contend that the Hearings Officer improperly limited her review to the 4/8/08 IEP, the 9/8/08 IEP, the 5/18/09 IEP, and the 6/23/09 IEP.  Plaintiffs argue that they "pled and presented evidence of the inadequacy of 11 IEPs and their accompanying PWNs, and two additional PWN's (sic) beginning in 2007-2008 and concluding with the 7/17/09 IEP prior to [Student

13

K.'s] placement at PAC in 7/09." [Opening Br. at 11 (citing RIH).] Plaintiffs assert that the Hearings Officer's improper limitation of the scope of the RIH led to other misperceptions in the Decision.

Plaintiffs argue, in making findings about the adequacy of Student K.'s IEPs, the Hearings Officer did not specify which IEPs she was referring to and failed to recognize the fact that each IEP change was apparently a failed attempt to address Student K.'s severe global deficits. Plaintiffs emphasize that, although the DOE knew of Student K.'s deficits since July 2006, her IEPs did not reflect eligibility for services under autism until the June 23, 2009 IEP. [Id. at 12.]

Based on the special education teacher's testimony, with which the ACT and the BISS agreed, the Hearings Officer also found that, during the 2007-2008 and the 2008-2009 school years, Student K. had "an intense, highly structured, educational program designed for her individual needs." [Decision at 14, ¶ 54; id. at 15, ¶ 58, 16, ¶ 62.] Plaintiffs argue that this finding was not supported by the record because the many incremental changes to Student K.'s IEPs indicate that the intensity of her program varied a great deal over the period in question. [Opening Br. at 12-13.] Plaintiffs argue that Student K.'s IEPs could not represent a floor of educational opportunity because it was "constantly shifting beneath Student K.'s already

14

globally deficient, unstable feet". [Id. at 23 n.9.]

Plaintiffs contend that the Hearings Officer erred in analyzing Student K.'s progress over the entire three years she was in the DOE system, rather than looking at her progress on an annual basis. Further, the Hearings Officer relied upon anecdotal testimony rather than on objective data. [Id. at 13.] Plaintiffs also argue that the Hearings Officer's finding that Student K. did not require direct physical therapy services was erroneous in light of the fact that the DOE did not conduct a core strength physical therapy evaluation and in light of the private physical therapy assessments that Plaintiffs obtained. [Id. at 13-14.]

**B.   Educational History Beyond the Statute of Limitations**

Plaintiffs acknowledge that there is a statute of limitations issue in this case, and they will stipulate that they can only recover for actions that the DOE undertook, or failed to undertake, during the limitations period, *i.e.* within two years prior to the July 15, 2009 RIH. [Opening Br. at 33-34.] Plaintiffs, however, emphasize that the DOE had a continuing duty to conduct a comprehensive evaluation of Student K. because it failed to conduct a comprehensive evaluation upon her enrollment. Plaintiffs argue that the DOE breached this duty until it administered the Assessment of Basic Language and Learning Skills ("ABLLS") in July 2009. [Id. at 33.] Plaintiffs also argue that

15

the Hearings Officer should have considered events occurring before the limitations period for context.  [Id. at 34.]

Further, the August 10, 2007 IEP team was erroneously configured because it did not have an autism specialist.  [Id. (citing Resp. Ex. 7, p. KP-0043).]  As a result, there was no one present at the meeting who could interpret any objective evidence of Student K.'s lack of progress.  Plaintiffs also argue that the IEP team failed to consider either the DOE annual progress reports or available cognitive/academic assessment results in formulating the IEP.  [Id. at 35-36.]  Plaintiffs contend that the failure to consider Student K.'s lack of progress resulted in the formulation of an inadequate IEP, and this same faulty process was repeated in the IEP team meetings on November 2, 2007, February 14, 2008, and April 8, 2008.  [Id. at 36-37 (citing Pet. Ex. "16", p. 299 (11/2/07), "15", p. 277 (2/14/08), "14", p. 253 (4/8/08); Resp. Ex. "27", p. KP-155).]  Plaintiffs contend that, had the IEP team properly examined Student K.'s lack of progress, it would have known that a comprehensive evaluation was necessary and the team could have implemented autism-supporting SPED and related services.

## C.   SIBS vs. Emerging Communication Attempts

Plaintiffs argue that this Court reviews administrative findings of fact for clear error.  [Id. at 40.]  Plaintiffs argue that the Hearings Officer's finding that Student K.'s SIBS -

16

"crying, dropping to the floor, head banging" - were emergent communication attempts.  The Hearings Officer overlooked credible witness testimony that these behaviors were signs of Student K.'s anxiety and frustration because of her inability to communicate. [Id. at 41 (citing TR Vol. III, p. 593, L. 18-21, p. 606, L.24-p. 607, L. 245).]  Plaintiffs contend that the Hearings Officer's finding was clear error and/or plain error.

### D. Failure to Evaluate Suspected Autism

Plaintiffs contend that the DOE's failure to conduct a comprehensive evaluation in light of Student K.'s suspected autism constitutes a procedural denial of a FAPE.  They argue that the Hearings Officer did not address the fact that the DOE failed to conduct a comprehensive evaluation for Student K.'s suspected autism until late July 2009 and that this delay affected her eligibility, progress, and the adequacy of the educational floor that her IEPs created.  Even the DOE's objective data showed that Student K. did not progress until the time of the UCLA Evaluation.  [Id. at 14-15.]  At the May 18, 2009 IEP meeting, however, the IEP team rejected the recommendations in the UCLA Evaluation.  [Id. at 16 n.4.]  Thus, Plaintiffs argue that the "[f]ailure to comprehensively evaluate caused significant delay in the creation and implementation of appropriate foundationally targeted educational interventions . . . contradicting [the Hearings Officer's] conclusion that

17

there is no evidence of harm[.]" [Id. at 17 n.4 (citing Pet. Exh. "33").]  Plaintiffs note that the DOE did not provide any reason for the delay in conducting an autism specific assessment and, an increase in Student K.'s ABA-DTT services was recommended after the assessment.  Plaintiffs had previously requested these changes, but the DOE denied the requests and Student K. did not receive those services until she was at PAC.  [Id. at 18-19 n.4.]

Plaintiffs point out that the DOE had notice since July 2006 that a potential autism diagnosis was responsible for Student K.'s poor performance.  [Id. at 42 (citing Pet. Ex. "71", pp. 1061-62; Pet. Ex. "35").]  The DOE, however, failed to obtain a timely initial comprehensive evaluation and failed to inform Plaintiffs that it would reimburse them if Plaintiffs obtained such an evaluation themselves.  Plaintiffs argue that the failure to conduct a comprehensive initial evaluation resulted in the failure to develop and implement an IEP that would deliver a FAPE to Student K., and this failure continued through the attachment of liability on July 15, 2007.  [Id.]

Plaintiffs note that the DOE issued a September 6, 2007 Prior Written Notice ("PWN"), without calling an IEP team meeting, noting that it sought various assessments of Student K., which the DOE called "reevaluations".  [ROA, Pets.' Exh. 18.] Plaintiffs, however, argue that the assessments could not have been reevaluations because the DOE never conducted a

18

comprehensive evaluation of Student K. in the first place.
[Opening Br. at 19.]   Plaintiffs assert that "[g]lobal
developmental delays, autism, MR, fine and gross motor
impairments, and visual impairments were all suspected that
triggered DOE's duty to undertake a comprehensive evaluation in
all areas of suspected disability[.]"   [Id. at 23 n.10 (citing 20
U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304(c)(4) & (c)(6)).]
Plaintiffs argue that, while the Hearings Officer may have been
correct that the DOE, Plaintiffs, and the private evaluators
agreed about Student K.'s levels of performance, the Hearings
Officer failed to recognize that, without knowledge of the cause
of Student K.'s needs, the IEP could not formulate appropriate
interventions.   [Id. at 23 n.11.]   Thus, even after the team
reviewed the UCLA Evaluation, it did not adequately develop
and/or implement "[n]ecessary Autism-specific supports and
related services", and Student K. did not receive these until she
enrolled at PAC.   [Id. at 24 n.11.]

     Plaintiffs also complain that the DOE issued another
PWN on October 6, 2007 making various changes to Student K.'s
program, including specifying that "picture schedule, PECS signs"
would be used in her classroom.   [ROA, Pets.' Exh. 17.]   First,
Plaintiffs note that the changes to Student K.'s program were
based upon her developmental delays, which had not changed since
she enrolled in the DOE system in 2006.   Plaintiffs state that

this "was the first in a long line of IEP changes based solely upon preexisting knowledge of Student K.'s needs from 6/06-7/09, which DOE failed to timely implement."  [Opening Br. at 20-21 (citation omitted).]  These changes based on preexisting knowledge show that the DOE failed to adequately address Student K.'s needs upon her initial enrollment.  [Id. at 23 n.9.]

In summary, Plaintiffs argue that

[r]egardless of when DOE's ad hoc evaluations were administered, no evaluation or series of DOE partial evaluations, assessments, tests, consultations, observations, and/or reports administered by the DOE, either in whole or in part, amounted to the comprehensive evaluation required under IDEA to follow-up on the suspected Autism and Developmental Coordination Disorder, sufficient to allow the IEP team to develop, create and implement an appropriate IEP . . . .

[Id. at 27-28 (footnote omitted).]  Plaintiffs argue that the DOE procedurally denied Student K. a FAPE, and therefore the Court need not reach the question of substantive compliance if the procedural denial resulted in the loss of educational opportunities or caused a deprivation of educational benefits. [Id. at 45 (citing 20 U.S.C. § 1400 et seq.; N.B. and C.B. v. Hellage Elem. Sch. Dist., 541 F.3d 1202, 1207 (9th Cir. 2008)).]

Plaintiffs also raise three sub-issues regarding the evaluations of Student K.  First, Plaintiffs argue that the Hearings Officer erred in finding that the DOE completed its evaluations in a timely manner after Plaintiffs gave their consent.  Plaintiffs assert that they never withheld consent for

evaluations of Student K.  Further, even if parents temporarily withhold consent to a particular evaluation, that does not relieve the DOE from its duty to conduct a comprehensive evaluation of the student.  [Id. at 45.]

Second, Plaintiffs argue that the Hearings Officer committed reversible error in treating the DOE's evaluations in July 2009 as interchangeable with the UCLA Evaluation. Plaintiffs argue that the Hearings Officer should have assessed whether the IEP team responded appropriately to the comprehensive UCLA Evaluation and whether the IEP team's failure to adopt the UCLA Evaluation negatively impacted Student K.'s learning. Plaintiffs contend that the reason the DOE insisted upon its own evaluations was to avoid the ASD diagnosis and to avoid providing the intensive services necessary to address it.  [Id. at 46-47.]

Third, Plaintiffs argue that the Hearings Officer failed to consider Plaintiffs' private evaluations of Student K., as well as the DOE's failure to conduct its own evaluations, until confronted with the results of the private evaluations. [Id. at 47-48.]  The Hearings Officer expressly found that Student K. had not seen a private speech pathologist, when in fact Student K. had done so, and the speech pathologist testified at the hearing.  Further, the Hearings Officer did not refer to the testimony of Plaintiffs' witnesses and providers, including Mary Marasovich and Carol Riccio in the Decision.  Plaintiffs

21

argue that those witnesses' testimony and reports were relevant to the assessment of Student K.'s needs, which was a central issue in the case, particularly in light of the fact that the Hearings Officer found that there was a factual dispute regarding the nature and severity of Student K.'s communication needs. Moreover, the Hearings Officer relied upon individual witnesses' subjective descriptions of the severity of Student K.'s needs, and those could have differed from one professional to another. [Id. at 48-49.]

### E.    **Provision of a "Basic Floor"**

Plaintiffs argue that the DOE did not provide Student K. with a basic floor of opportunity at Kamali`i, as evidenced by the fact that she made only trivial progress during her three years there and she regressed in some areas.  They also argue that the Hearings Officer's finding that Student K.'s goals and services were adequate is contradicted by Student K.'s lack of progress, particularly where she remained non-verbal in spite of the fact that she exhibited a preference for vocalizing.  [Id. at 53-54.]  Plaintiffs also emphasize that they, as well as others including the BISS, the UCLA evaluators, and PAC, consistently asked "for an increase in [S]tudent K.'s opportunities for learning."  [Id. at 54 (citing Appx. C).]

F.   **Whether the Program & Placement Provided a FAPE**

1.   **ABA Techniques**

Although the Hearings Officer concluded that the DOE provided Student K. with ABA based strategies and techniques, Plaintiffs argue that the DOE did not provide timely training for Student K.'s providers in ABA strategies and DTT.  [Id. at 55 (citing hearing testimony).]

2.   **Failure to Implement Aspects of Student K.'s IEPs**

Plaintiffs argue that a material failure to implement a student's IEP constitutes a violation of the IDEA.  The materiality standard does not require a showing of harm to the student, but the lack of educational progress may be probative on the issue whether the shortfall in services was significant. [Id. at 56 (citing Van Duyn v. Baker Sch. Dist. 5J, 481 F.3d 770, 778 (9th Cir. 2007)).]

a.   **Inadequate DTT Implementation**

Plaintiffs argue that the following DOE omissions denied Student K. a FAPE: failure to formulate a plan for DTT programing; and failure to collect data to document progress toward DTT targets for the 2007-2008 school year.  [Id. at 57 (citing RA, Vol. III, p. 637, L. 6-17).]  Plaintiffs emphasize that the ACT stated that Student K. "suffered actual harm in that she 'lost time' for two-years at Kamali`i."  [Id. (quoting Pet. Ex. "60"; Recording 9/8/08 IEP Meeting, 23:10 Time Stamp).]

23

### b.   <u>Signing Goal/Objective</u>

The July 8, 2008 IEP included "sign" as a goal/objective for Student K.'s communication.  [<u>Id.</u> at 57.] Plaintiffs state that the DOE never implemented this goal/objective.  Although Student K. had a limited ability to sign, and it was her preferred method of communication when she entered the DOE system, none of the DOE staff who worked with her knew American Sign Language ("ASL").  Plaintiffs argue that the failure to implement sign was a "material failure to implement the IEPs and PWNs which mandate that multi-functional communication modalities be offered, supported, and taught." [<u>Id.</u> at 20 n.5.]  If Student K.'s IEP team made a conscious decision to eliminate sign from her IEP, Plaintiffs argue that this was a significant procedural and substantive error because the DOE failed to indicate the change in a PWN and the team did not discuss the matter at a meeting.  [<u>Id.</u>]

Plaintiffs argue that the failure to implement the signing goal/objective was critical because Student K. could not communicate her needs, which put her at risk of developing problematic behavior, and because she was approaching the end of the developmental age window where "'there are likely to be explosions of words'".  [<u>Id.</u> at 58 (quoting RA, Vol. I, p. 57, L. 19-24).]

### c.   **Pointing Objective**

Student K.'s August 10, 2007 IEP targeted "'pointing to body parts.'"  [Id. at 59 (quoting Pet. Ex. "19", p. 358).] Student K.'s special education teacher, BISS, and speech therapist, however, refused to implement this because they believed that it would encourage her to be rude and demanding. [Id. at 59-60 (quoting RA, Vol. III, p. 631, L. 7 to p. 632, L. 13).]  In fact, they discouraged her from pointing by redirecting her to her PECS book or other picture icons.  [Id. at 62 (citing RA, Vol. I, p. 632, L. 10-13).]

Thus, Student K. was unable to point, except to her PECS on an inconsistent basis, when she enrolled in PAC.  She could only communicate by pulling a person toward what she wanted and by engaging in SIBS.  Plaintiffs argue that pointing is a critical step in the development of communication abilities. [Id. at 60-61.]  Once at PAC, Student K. learned "pointing" in one session.  [Id. at 62 (quoting RA, Vol. I, p. 193, L. 11-20).]

### 3.   **Appropriateness of Kamali`i Placement**

Plaintiffs argue that the Kamali`i initial placement in a special education preschool classroom was inappropriate in light of Student K.'s autism-related needs.  Student K.'s placement remained the same, and was similarly inappropriate, in the 2007-2008 school year.  [Id. at 25 n.11 (citing TR Vol. II, pp. 374, L. 21-p. 390, L. 7).]  For example, Student K.'s IEP did not

provide for regular access to a quiet therapy room for regulation and skill-acquisition until September 8, 2008.  Further, although the ACT testified that the most important focal points for Student K. were regulation and language, the IEP team placed cooperation and response to reinforcement as the top priority. Plaintiffs argue that this was part of an attempt to control Student K.'s deteriorating behavior.  [Id. at 26 n.11.]

Plaintiffs argue that Student K. only made progress in one goal in the 2006-2007 school year,[5] but the IEP did not consider that fact in formulating the 2007-2008 IEP.  Plaintiffs argue that, in light of Student K.'s limited progress during the year prior, the IEP team should have adopted and implemented the recommendations by the private providers that Plaintiffs retained.  The DOE, however, failed to implement the changes recommended in the private evaluations.  Student K. made only minimal progress on her goal/objectives for the 2007-2008 school year.  [Id. at 28.]  Ultimately, on July 3, 2009, Student K. "was in the same place in her achievement and function relative to normally developing peers, as she was when she enrolled in 6/06." [Id. at 29.]  Plaintiffs argue that the evidence presented at the hearing did not support the Hearings Officer's finding that Student K. "mastered pre-academic skills."  [Id. at 30 (citing

_____

[5] The only goal Student K. mastered during the 2006-2007 school year was to sit in a group for one minute.  [Opening Br. at 64 (quoting RA, Vol. II, p. 361, L. 17-23).]

26

Decision at ¶ 67).]  In fact, Student K. could not work on many of her IEP goals because she did not have the requisite skills in place to approach those goals.  This was a serious problem that Mother raised in the April 8, 2008 IEP team meeting.  [Id. (citing Pet. Ex. "14", p. 240).]

Plaintiffs argue that the Hearings Officer erred in finding that Student K. had made "meaningful educational progress" by the end of the 2007-2008 school year.  [Id. at 30-31.]  The Hearings Officer relied on anecdotal testimony from DOE witnesses who gave their subjective beliefs regarding Student K.'s progress from June 2006 to July 2009.  Plaintiffs argue that this testimony is contradicted by the objective data, which shows no progress.  Plaintiffs emphasize that, once Student K. received a highly structured environment and adequately trained staff at PAC, she "immediately mastered vastly broader skill sets and reversed her previous behavioral deterioration."  [Id. at 31 (citing Pet. Ex. 72 (some citations omitted)).]

Plaintiffs argue that, based on the evidence, this Court should find that the DOE procedurally and substantively denied Student K. a FAPE in the 2007-2008 and the 2008-2009 school years.  [Id. at 65.]

4.   **Unilateral Change in Placement**

Plaintiffs contend that the Kamali`i principal unilaterally changed Student K.'s placement on May 19, 2009 by

denying her a geographic exception ("GE").  The principal
ostensibly based the decision on the fact that Kamali`i was
filled to capacity and that Plaintiffs failed to complete a GE
form on a timely basis.  Plaintiffs, however, argue that Student
K. should already have been counted in the Kamali`i student body
because she was already enrolled there.  Further, Plaintiffs did
not know they had to fill out the particular GE form.  [Id.
(citing Resp. Ex. "70", p. KP-483; TR Vol. V p. 1018, L. 17-p.
1022, L. 20).]  Plaintiffs contend that this was a procedurally
improper administrative change in placement and that only the IEP
team could make the decision to change Student K.'s school.  The
IEP team discussed the change at the June 23, 2009 meeting, but
the change in placement was not an IEP decision, and the IEP team
never issued a PWN about it.  [Id. at 66 (citing Pet. Ex. "4",
"6", "8").]  Plaintiffs contend that the change in placement was
not reasonably calculated to enable Student K. to access
education and/or to derive a meaningful educational benefit.
Plaintiffs therefore assert that they were justified in rejecting
the 6/23/09 IEP and placing Student at PAC.  [Id.]

G.    **Reimbursement for PAC Placement**

     Finally, Plaintiffs argue that they are entitled to
reimbursement for their expenses incurred at PAC, including
relocation expenses.  Plaintiffs argue that the DOE denied
Student K. a FAPE previously and, in the 6/23/09 IEP, the

28

placement offered at Kihei Elementary ("Kihei") was not
reasonably calculated to enable Student K. to receive educational
benefits.  Plaintiffs therefore rejected the placement and
enrolled Student K. in PAC.  [Id. 67-68.]  Plaintiffs emphasize
that, upon the DOE's denial of a FAPE, the private placement
should be reasonably calculated to enable Student K. to receive
educational benefits, but it need not necessarily meet the FAPE
standard.  [Id. at 69 (citations omitted)).]  Plaintiffs
acknowledge that the Court's authority to grant reimbursement is
discretionary and that equitable considerations are relevant, in
addition to objective evidence in the record indicating whether
the student was likely to progress in the private placement.
Plaintiffs presented a report by Colin Denney, Ph.D., who opined
that Student K.'s prognosis was poor if she did not immediately
receive more intensive and comprehensive services.  Dr. Denny
also opined that PAC was an appropriate placement, although it
was not the only adequate placement available.  [Id. at 69-70
(citing Pet. Ex. "62", p. 992-94).]

        Plaintiffs argue that PAC is the least restrictive
environment that will provide meaningful educational benefits for
Student K.  [Id. at 70.]  Plaintiffs contend that it is doubtful
that Student K. would benefit from main-streaming because she is
unable to effectively socialize and she does not have the skills
necessary to benefit from main-streaming.  Further, it would be

unduly burdensome on teachers and students in a regular classroom, and the costs of main-streaming Student K. would be prohibitive.  [Id. at 72-73.]  Plaintiffs argue that even education in a special education classroom would only allow Student K. to make minimal progress.  [Id. at 74.]

Plaintiffs therefore urge the Court to award them reimbursement for Student K.'s PAC placement and related costs. Plaintiffs also seek compensatory education, reasonable attorneys' fees and costs, and any other remedies that the Court deems appropriate.

### III. Defendant's Answering Brief

In its Answering Brief, Defendant first notes that it did not address Plaintiffs' points of error which did not have legal support or a citation to the evidentiary record. [Answering Br. at 1 n.2.]  In Defendant's view, the Opening Brief presents five issues:

> 1.   Whether the Hearing Officer failed to consider relevant evidence and as a result arrived at erroneous conclusions.
> 2.   Whether the DOE failed to appropriately evaluate Student in all areas of suspected disability.
> 3.   Whether Student's IEP failed to offer a FAPE.
> 4.   Whether the DOE failed to implement Student's IEP.
> 5.   Whether Parents are entitled to reimbursement for Student's unilateral placement at PAC.

[Id. at 2.]  Defendant argues that the Hearings Officer carefully addressed all of Plaintiffs' allegations and determined that

Plaintiffs failed to prove a denial of a FAPE.  [Id.]  Defendant also emphasizes that Plaintiffs cannot raise issues that they failed to raise at the due process hearing and in their RIH, and that Plaintiffs have waived any issues that they did not specifically argue in their Opening Brief.  [Id. at 7-8.]

###    A.    Defendant's Recitation of the Facts

Defendant argues that Student K.'s educational program was appropriate for her needs and that the IEP team adjusted the amount of time allocated for her services when warranted after revaluation.  [Id. at 8-9.]

Defendant highlights the hearing testimony of the following witnesses: Rachel Huckfeldt, Student K.'s BISS; Sandrina Redfearn, her ACT; Arthur Bein, her special education teacher; Crystal Bocher, her DOE occupational therapist; and Linda Griffith, the DOE physical therapist who provided consultive services to Student K.  Defendant argues that those witnesses' testimony about Student K.'s program supported the Hearings Officer's finding that the contested IEPs offered Student K. a FAPE.

Defendant argues that the objective evidence in the record shows that Student K. made educational progress on her IEP goals and objectives, including: "Independent Eating (No. 84, KP 590), Attention to Task (No. 84, KP 592), Two-Step Motor Planning (No. 84, KP 594), Fine Motor activities (Lacing, Tracing,

31

Writing) [No. 84, KP 610], Expanding Use of Vocalizing Sounds (No. 87, KP 629)." [Id. at 15 (citing ROA 20, Resp. Exhs.).] Further, the DOE ensured coordination and continuity through weekly meetings to discuss Student K.'s program and monthly meetings to make necessary adjustments to her program. [Id. (citing ROA 27, TR. Vol. V, at 1001-1002; ROA 26, TR. Vol. IV, 750:4-17).]

As to the denial of Student K.'s GE, Defendant states that Kamali`i denied Plaintiffs' request for a GE because of budgetary issues. There were transition meetings in June and July 2009 to facilitate her transition to her home school, Kihei. [Id. at 16 (citing ROA 21, Resp. Exh. No. 100, p. KP 1318, 1321).] There were also three IEP team meetings in May, June, and July 2009 to prepare for the 2009-2010 school year. The July 2009 meeting occurred on July 17, 2009, two days after Plaintiffs filed the RIH. [Id. (citing ROA 20, Resp. Exh. Nos. 69, 74, 78 (IEPs)).] Also in preparation for the new school year, the DOE scheduled assessments of Student K. Defendant argues that this is evidence of its continuing effort to provide an appropriate program for Student K.'s needs. [Id. (citing ROA 21, Resp. Exh. No. 100, p. KP 1321).] Defendant emphasizes that Plaintiffs: did not challenge the appropriateness of the July 17, 2009 IEP; [id. (citing ROA 19, Resp. Exh. No. 1, p. KP 005 (comp.), ROA 1, Exhibit 1);] and unilaterally enrolled Student K. at PAC even

32

before PAC conducted any assessments to design her program [id. at 17 (citing ROA 23, TR. Vol. I, p. 139:11-17)].

**B.    Whether the Hearings Officer Ignored Relevant Evidence or Legal Authority**

Although Plaintiffs argue that the Hearings Officer ignored evidence outside of the two-year statute of limitations period, the Hearings Officer actually made extensive and thoughtful findings and conclusions, several of which were beyond the statute of limitations period.  As to Plaintiffs' argument that the Hearings Officer mischaracterized Student K.'s SIBS as attempts to communicate, Defendant argues that it is unclear which of the Decision's conclusions Plaintiffs rely on to support this claim.  Further, even if Plaintiffs could identify a particular conclusion, such a characterization is simply a matter of perspective and opinion and cannot constitute plain error. Defendant argues that there is ample factual support for the Decision and that Plaintiffs have failed to cite any authority which would support a finding that the Hearings Officer's findings and conclusions were an abuse of discretion.  Plaintiffs merely disagree with the Decision without a valid basis for an alternate ruling.  [Id. at 17-19.]

**C.    Evaluation in All Areas of Suspected Disability**

Defendant argues that the only reason for the delay in Student K.'s assessments was Plaintiffs' withholding of their consent.  At the May 2009 IEP team meeting, there were requests

33

for a physical therapy evaluation, speech language evaluation, and an academic evaluation.  The Kamali`i principal noted that the DOE had been trying to conduct a physical therapy evaluation since November 2008, but Plaintiffs would not consent to the evaluation because they objected to the objectivity of the DOE physical therapist.  Plaintiffs ultimately consented to an evaluation with a therapist on O`ahu.  The principal noted that, once Plaintiffs gave their consent, the evaluations were completed in a timely manner.  [Id. at 19-20 (citing ROA 27, Vol. V, at 996-999).]

Defendant contends that the UCLA Evaluation is not evidence that the DOE failed to conduct necessary evaluations of Student K.  The DOE understood her needs, and the UCLA Evaluation did not result in any changes to her program because her IEPs already addressed her needs appropriately.  The only useful information was for the characterization of Student K.'s IDEA eligibility criteria as autism.  [Id. at 20 (citing ROA 27, Vol. V, at 996-97:21-1).]  Defendant argues that Plaintiffs fail to point to any evidence in the record that the failure to conduct evaluations led to missed educational opportunities or to the deprivation of educational benefits.  [Id. at 21.]

D.    **The Challenged IEPs**

Defendant argues that the evidence presented at the hearing establishes that Student K.'s IEPs were appropriate for

34

her needs and were reasonably calculated to ensure that she

received educational benefit in the least restrictive

environment.  Defendant also argues that Student K.'s progress

reports and data collected for two years show that she was making

educational progress.  [Id.]

     As to Plaintiffs' argument that there was no plan for

data collection, Defendant points out that Student K.'s IEP

states that her goals will be measured by observation and

records.  [Id. (citing ROA 20, Resp. Exh. No. 74, p. KP 519).]

Plaintiffs failed to identify any authority showing that this

plan was inadequate.  [Id. at 21-22.]

     As to the other alleged failures to implement the

challenged IEPs, Defendant argues that Plaintiffs have not

identified any evidence that the alleged failures had a negative

impact on Student K.  Plaintiffs therefore cannot establish that

any failure to implement the IEPs was material.  [Id. at 22.]

**E.   Unilateral Change in Placement**

     Defendant argues that Plaintiffs' RIH did not raise the

issue of the Kamali`i principal's unilateral change in Student

K.'s placement.  The Court therefore cannot allow Plaintiffs to

argue that issue in these proceedings.  [Id. at 22-23.]

**F.   Reimbursement for Private Placement**

     Finally, the DOE argues that Plaintiffs are not

entitled to reimbursement for Student K.'s PAC placement because

the DOE offered her a FAPE.  In light of the Hearings Officer's finding of a FAPE, she did not reach the reimbursement issue.  If the Court finds that the DOE did not offer a FAPE, the Court must remand the reimbursement issue.  [<u>Id.</u> at 23.]

## IV.  **Plaintiffs' Reply Brief**

In their Reply Brief, Plaintiffs reiterate that this Court should not defer to the Hearings Officer's findings of fact.  Plaintiffs assert that they have cited both evidence and legal authority in their argument.  [Reply Br. at 11-15.]

### A.  **Waiver**

As to Defendant's argument that Plaintiffs waived the unilateral placement issue and the mental health services issue, Plaintiffs argue that the RIH and the evidence at the hearing did address Student K.'s mental health needs as they impacted her learning.  Plaintiffs also argue that the Hearings Officer failed to address many of the issues that they raised in the RIH.  [<u>Id.</u> at 15.]  Plaintiffs contend there was no waiver because "where a 'fair reading' of the opening brief, either explicitly or implicitly raises an issue, and the school District argued that its actions 'were timely,' an argument will not be deemed waived."  [<u>Id.</u> at 15-16 (some citations omitted) (citing <u>J.G., et al., v. Douglas County Sch. Dist.</u>, 552 F.3d 786, 796 (9th Cir. 2008)).]

B.   **Procedural Denials of a FAPE**

Plaintiffs reiterate that the DOE violated its "child find" duty by failing to evaluate Student K. for her suspected ASD. [<u>Id.</u> at 16 (citations omitted)).]  Plaintiffs argue that the threshold for suspicion of autism is relatively low, and Student K. exhibited all of the characteristics that are often associated with autism.  [<u>Id.</u> at 17 (citations omitted).]  There was no reason for the DOE to delay its initial evaluation of Student K., and its failure to evaluate her at the beginning of the 2007-2008 school year was even more egregious because she made almost no progress at Kamali`i during the previous year. Plaintiffs argue that the failure to evaluate Student K.'s suspected autism was a denial of a FAPE because, without the evaluation, it was not possible to determine how her condition impacted her learning and to develop an appropriate IEP.  [<u>Id.</u> at 17-19 (citing Appx. F (<u>Lake Orion Co. Schs.</u>, 110 LRP 30467 (SEA MI.07/29/09)).]  Plaintiffs emphasize that autism must be diagnosed early and, while it is not curable, its symptoms can be mitigated so that the student can integrate into the natural learning environment.  [<u>Id.</u> at 19.]

Plaintiffs argue that the DOE represented that Student K.'s "lack of progress stemmed from her not being 'cognitively ready,' a tactful and conciliatory way of saying she is too severely MR to learn[.]"  [<u>Id.</u> at 20 (citing Pet. Ex. 20, p.

380).]  Plaintiffs and Student K.'s private providers repeatedly challenged this alleged inability to learn.  Plaintiffs reiterate that the Hearings Officer failed to consider or analyze the testimony of the private providers, even when the DOE withdrew objections to the admissibility of that testimony.  [Id. at 20-21 (citations omitted).]

Plaintiffs acknowledge that many children can legitimately be characterized under multiple areas of eligibility and that it is possible to develop an appropriate IEP for a student who arguably is in the wrong category.  Plaintiffs, however, argue that this is only possible where the student has been evaluated for all areas of suspected disability, which was not done in the instant case.  [Id. at 22-23.]  Plaintiffs argue that the failure to evaluate Student K. for ASD was an "insurmountable procedural error" that denied her a FAPE from the August 2, 2006 IEP through her placement at PAC, where she was immediately evaluated with relevant ASD assessments.  [Id. at 24 (citations omitted).]  The DOE had notice that Student K.'s deficits might be autism-related and therefore it was the DOE's responsibility to correct the flaw in her IEP development.  [Id. at 24-25 (citation omitted).]  Plaintiffs argue that the failure to properly assess Student K.'s suspected autism clearly resulted in a loss of educational opportunity, as evidenced by her lack of progress, and deprived Plaintiffs of their right to informed

38

decision-making regarding her education.  [Id. at 26.]

### C.   Substantive Denials of a FAPE

Plaintiffs argue that the failures to implement Student K.'s IEPs that they discussed in the Opening Brief were material, and therefore proof of actual harm is not required.  Thus, Defendant's argument, which only challenges the record as to evidence of harm, fails.  [Id. at 27-29.]  Further, Plaintiffs argue that there is evidence of actual harm because of Student K.'s lack of skills when she entered PAC and her rapid acquisition of those skills at PAC.  [Id. at 29-30.]  The Hearings Officer's finding that Student K. made appropriate progress at Kamali`i was a summary conclusion that was not supported by the year-by-year evidence.  [Id. at 30.]

### D.   PAC Tuition Reimbursement & Compensatory Education

Plaintiffs argue that remand of the reimbursement issue is not necessary because there is undisputed evidence of the reasons for Plaintiffs' unilateral placement, as well as undisputed evidence of the appropriateness of placement at PAC. Plaintiffs argue that the drafting of an IEP after the filing of the RIH does not limit the availability of equitable relief. [Id. at 31-32.]  Plaintiffs also emphasize that the equitable remedy of compensatory education is available to put Student K. in the position that she would have been in without the DOE's violations of the IDEA.  [Id. at 32-33 (citations omitted).]

39

**STANDARDS**

I.   **IDEA Overview**

       "The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1300 (9th Cir. 1992) (citing Honig v. Doe, 484 U.S. 305, 310, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988)).  The IDEA ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  According to the IDEA, a FAPE is

        special education and services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the school standards of the State educational agency; (C) include an appropriate preschool, elementary school or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education and services, conduct and implement an IEP, and determine an appropriate educational placement of the student. 20 U.S.C. § 1414.

       Student's FAPE must be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)." Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 181, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982) ("Rowley") (citing 20 U.S.C. § 1401(18)).  The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing

40

> (A) a statement of the present levels of
> educational performance of such child, (B) a
> statement of annual goals, including
> short-term instructional objectives, (C) a
> statement of the specific educational
> services to be provided to such child, and
> the extent to which such child will be able
> to participate in regular educational
> programs, (D) the projected date for
> initiation and anticipated duration of such
> services, and (E) appropriated objective
> basis, whether instructional objectives are
> being achieved.
>
> 20 U.S.C. § 1401(19).  Local or regional
> educational agencies must review, and where
> appropriate revise, each child's IEP at least
> annually.  20 U.S.C. §§ 1414(a)(5),
> 1413(a)(11). . . . .

J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F.3d 431,
432 (9th Cir. 2010).

"Procedural flaws in the IEP process do not always
amount to the denial of a FAPE."  L.M. v. Capistrano Unified Sch.
Dist., 556 F.3d 900, 909 (9th Cir. 2009) (citations omitted).
Once a procedural violation of the IDEA is identified, the court
"must determine whether that violation affected the substantive
rights of the parent or child."  Id. (citations omitted).
"[P]rocedural inadequacies that result in the loss of educational
opportunity, or seriously infringe the parents' opportunity to
participate in the IEP formulation process, clearly result in the
denial of a FAPE."  Id. (alteration in original) (citations and
quotation marks omitted).

Compliance with the IDEA does not require school
districts to provide the "absolutely best" or "potential-

41

maximizing" education.  J.W., 626 F.3d at 439 (citation and internal quotation marks omitted).  Rather, school districts are required to provide only a "'basic floor of opportunity.'"  Id. (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 201 (1982)).  The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit."  Id. at 433 (citations and quotation marks omitted).

     If a parent disagrees with the contents of an IEP, the parent may challenge the contents thereof by demanding an administrative due process hearing to be conducted by the local or state educational agency.  See 20 U.S.C. § 1415(b)(6), (f)(1)(A).  Parents may also send their student to a private program and seek retroactive tuition reimbursement from the state.  See Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2493, 2496 (2009) (citations omitted).  Where parents unilaterally withdraw a child from public school, they "do so at their own financial risk."  Id. at 2496 (citations and internal quotation marks omitted).  Parents challenging an IEP are entitled to reimbursement only if "a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act."  Id. (citations and internal quotation marks omitted); see also 34 C.F.R. § 300.148(c).

## II.  **Standard of Review**

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the court –
> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that the district court give "'due weight'" to the administrative proceedings. L.M., 556 F.3d at 908 (citations omitted). The district court, however, has the discretion to determine the amount of deference it will accord the administrative ruling. J.W., 626 F.3d at 438 (citing Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)). In reaching that determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference where said findings are "'thorough and careful.'" L.M., 556 F.3d at 908 (quoting Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995)). The district court should give "substantial weight" to the hearings officer's decision when the decision "evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented." Cnty. of

San Diego v. Cal. Special Educ. Hearing Office, 93 F.3d 1458,

1466-67 (9th Cir. 1996) (citation and quotation marks omitted)).

Such deference is appropriate because "if the district court

tried the case anew, the work of the hearing officer would not

receive 'due weight,' and would be largely wasted." Wartenberg,

59 F.3d at 891.  "[T]he ultimate determination of whether an IEP

was appropriate," however, "is reviewed de novo." A.M. ex rel.

Marshall v. Monrovia Unified Sch. Dist., 627 F.3d 773, 778 (9th

Cir. 2010) (citing Wartenberg, 59 F.3d at 891).

          A court's inquiry in reviewing IDEA administrative

decisions is twofold:

> "First, has the State complied with the procedures
> set forth in the Act?  And second, is the
> individualized educational program developed
> through the Act's procedures reasonably calculated
> to enable the child to receive educational
> benefits?"  [Rowley, 458 U.S. at 206-07]
> (footnotes omitted).  "If these requirements are
> met, the State has complied with the obligations
> imposed by Congress and the courts can require no
> more."  Id. at 207.

J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947 (9th Cir.

2010) (some citations omitted).

          The burden of proof in an IDEA appeal proceeding is on

the party challenging the administrative ruling.  Hood v.

Encinitas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007)

(citations omitted).  The challenging party must show, by a

preponderance of the evidence, that the hearing decision should

be reversed.  J.W., 626 F.3d at 438 (citations omitted).

## DISCUSSION

Plaintiffs' Opening Brief raises numerous issues and sub-issues, some of which they present in their "STATEMENT OF FACTUAL ERRORS" rather than their "ARGUMENT" section.  All of Plaintiffs' arguments fall into the following categories: the scope of the Decision and the scope of this Court's review of the Decision; the failure to evaluate Student K.'s suspected autism in a timely manner; whether Defendant offered Student K. a FAPE in the IEPs at issue; whether Defendant implemented Student K.'s IEPs; and whether Plaintiffs are entitled to reimbursement for their unilateral placement of Student K. at PAC.[6]

## I.   Scope of the Decision & Scope of Review

### A.   IEPs at Issue for 2007-2008 and 2008-2009 School Years

In the Decision, the Hearings Officer framed the issue before her as: "Whether the April 8, 2008 [IEP], the September 8, 2008 IEP, the May 18, 2009 IEP, and the June 23, 2009 IEP offered Student a Free Appropriate Public Education[.]"  [Decision at 5.]

Plaintiffs allege that the Hearings Officer erred in limiting the scope of her review to those four IEPs.  Plaintiffs, however, raised this argument in their Opening Brief's statement of the facts, which Plaintiffs title "STATEMENT OF FACTUAL

_____

[6] To the extent that Plaintiffs raised any other arguments which this Court has not specifically addressed in this Order, those arguments are subsumed within the arguments addressed in the categories identified by this Court.

ERRORS".  Plaintiffs allege that the Hearings Officer's limitation of the issue to whether the four IEPs offered a FAPE was

> not supported by the record where Plaintiffs pled and presented evidence of the inadequacy of 11 IEPs and their accompanying PWNs, and two additional PWN's (sic) beginning in 2007-2008 and concluding with the 7/17/09 IEP prior to her placement at PAC in 7/09.  This narrow focus further enabled [the Hearings Officer's] misperceptions herein.

[Opening Brief at 11 (citations omitted).]  In supplemental briefing ordered by this Court, Defendant argued that the Hearings Officer appropriately considered all of Student K.'s IEPs.  If the Court is inclined to find that the Hearings Officer's consideration of all the IEPs was not adequate, Defendant argues that Plaintiffs waived the issue by failing to "specifically and distinctly" argue this point of error in their Opening Brief.  [Def.'s Suppl. Br. at 6 (citing United States v. Kama, 394 F.3d 1236, 1238 (9th Cir. 2005); Koerner v. Grigas, 328 F.3d. 1039, 1048 (9th Cir. 2003) (quoting United States v. Ullah, 976 F.2d 509, 514 (9th Cir. 1992))).]

First, while it is clear that the Hearings Officer **considered** all of the IEPs at issue, see, e.g. Decision at 22 ("The speech language therapy services, occupational therapy services and physical therapy consultation services offered to Student during the 2007-2008 and 2008-2009 school years, addressed her unique needs and provided her with adequate support

services to take advantage of educational opportunities."), it is equally clear that the Hearings Officer ultimately only **ruled** on the adequacy of four IEPs, id. at 27 ("[T]he Hearings Officer finds and concludes that [Plaintiffs] failed to prove that the April 8, 2008 IEP, the September 8, 2008 IEP, the May 18, 2009 IEP, and the June 23, 2009 IEP did not offer Student a FAPE."). The Court therefore finds that Hearings Officer failed to rule upon the sufficiency of each of the IEPs that Plaintiffs challenged in the RIH and in the administrative proceedings. The Court now turns to Defendant's argument that Plaintiff waived any claim of error arising from the Hearings Officer's failure to rule on all of the IEPs.

Defendant's waiver argument is based upon a well-established rule of appellate procedure that the Ninth Circuit, and other Circuits, follow. Defendant, however, has not cited, nor is this Court aware of, any case applying this rule in IDEA appeals of an administrative decision to a district court. Even assuming arguendo that Plaintiffs' Opening Brief did not give Defendant proper notice that Plaintiffs were raising the Hearings Officer's failure to expressly rule on each contested IEP as a point of error in their appeal, Defendant did not suffer any prejudice because Defendant had the opportunity to address the issue in Defendant's Supplemental Brief. In light of the lack of prejudice to Defendant and the importance of the issue, this

47

Court does not find that Plaintiffs waived the issue.

As to the question whether this Court should rule on the adequacy of the other IEPs that the Hearings Officer did not rule upon, Plaintiffs acknowledge that it is within a district court's discretion to remand a case to the hearings officer if the administrative record contains "insufficient guidance . . . as to the merits of a case." [Pltfs.' Suppl. Br. at 10 (citation omitted).]  Plaintiffs, however, emphasize that a district court may render a decision on the merits if the record is complete. Plaintiffs also argue that this would be a more efficient administration of justice, in light of the age of IEPs at issue and other factors.  [Id. at 10-11.]

Although all of the IEPs are part of the administrative record and Plaintiffs have an understandable desire to resolve this matter now rather than spend additional time and resources pursuing a remand, in this Court's view, the resolution of this issue would benefit from the Hearings Officer's specialized expertise.  Cf. C.B. v. Pittsford Cent. Sch. Dist., No. 08-CV-6462 CJS (P), 2010 WL 1533392, at *19 (W.D.N.Y. Apr. 15, 2010) ("Remand to the [impartial hearings officer ("IHO")] for a hearing is appropriate, since neither the IHO or [state review officer] addressed the merits of Plaintiff's 'additional services' claim, and since resolution of the claim would benefit from the administrative process." (citing Polera v. Board of

48

Educ. of Newburgh Enlarged City School Dist., 288 F.3d 478, 487
(2d Cir. 2002) ("The IDEA's exhaustion requirement was intended
to channel disputes related to the education of disabled children
into an administrative process that could apply administrators'
expertise in the area and promptly resolve grievances.  The
exhaustion requirement prevents courts from undermining the
administrative process and permits an agency to bring its
expertise to bear on a problem as well as to correct its own
mistakes. . . .  [T]he administrative system is uniquely well
suited to review the content and implementation of IEPs."))).
This Court cannot determine whether the Hearings Officer's
failure to rule on the adequacy of the other IEPs was inadvertent
or whether it was deliberate.  If the Hearings Officer
deliberately withheld a ruling, this Court cannot determine her
reasons for doing so.  Morever, the Hearings Officer's
specialized expertise would be particularly useful because
Plaintiffs challenge the substantive adequacy of Student K.'s
IEPs, some of which are very close in time and contain subtle
changes.  Cf. New York City Dep't of Educ. v. V.S., No.
10-CV-05120 (JG)(JO), 2011 WL 3273922, at *10 (E.D.N.Y. July 29,
2011) ("[I]n IDEIA cases, "[b]ecause administrative agencies have
special expertise in making judgments concerning student
progress, deference is particularly important when assessing an
IEP's substantive adequacy." (citing Cerra v. Pawling Cent. Sch.

Dist., 427 F.3d 186, 195 (2d Cir. 2005) (some alterations in
V.S.))).

        This Court therefore declines to address the

substantive adequacy of the other IEPs and PWNs that Plaintiffs

challenged in the RIH, but which the Hearings Officer did not

rule upon.  The Court REMANDS this case to the Hearings Officer

to rule on Plaintiffs' claims based on the remaining IEPs and

PWNs.

        **B.   Unilateral Change in Placement**

        Defendant also argues that this Court should not

consider Plaintiffs' argument based on the Kamali`i principal's

unilateral change in Student K.'s placement because Plaintiffs

raised this argument for the first time in their Opening Brief.

[Answering Br. at 22-23.]

        The Kamali`i principal denied Student K.'s GE

application, dated May 7, 2009, on May 19, 2009.  [ROA, Resp.'s

Exh. 70 (Geographic Exception Request Form).]  During the

administrative hearing, the Kamali`i principal testified that she

denied Student K.'s GE because Plaintiffs failed to submit the

form by the March 1, 2009 deadline.  Thus, for the 2009-2010

school year, Student K. was to return to Kihei, her home school.

[ROA, 5/6/10 Hrg. Trans. (Vol. V) at 1018-19.]  Although they did

not use the words "unilateral change in placement" in the RIH,

Plaintiffs clearly argued that the DOE did not offer Student K. a

50

FAPE for the 2009-2010 school year.  [RIH at 2 (ROA at 5).]
Plaintiffs' proposed findings and conclusions also stated that
the RIH sought, *inter alia*, a finding that Student K.'s IEPs did
not offer her a FAPE for the 2009-2010 school year.  [ROA at 96.]
An appropriate placement for a student is part of the provision
of a FAPE.  J.W., 626 F.3d at 432 ("To provide a FAPE in
compliance with the IDEA, a state educational agency receiving
federal funds must evaluate a student, determine whether that
student is eligible for special education and services, conduct
and implement an IEP, and determine an appropriate educational
placement of the student." (citing 20 U.S.C. § 1414)).
Plaintiffs' challenge to the unilateral change in Student K.'s
placement from Kamali`i to Kihei falls within their argument that
the DOE failed to offer Student K. a FAPE for the 2009-2010
school year.  The Court therefore FINDS that Plaintiffs did not
waive their challenge to the change in Student K.'s placement for
the 2009-2010 school year.

     The Decision, however, does not even mention the change
in Student K.'s placement for the 2009-2010 school year.  The
Decision does find that Student K.'s 6/23/09 IEP, which was
apparently intended to address Student K.'s services for the
2009-2010 school year, offered her a FAPE.  Although personnel
from Kihei attended the June 23, 2009 IEP meeting, the IEP
itself, and the PWNs associated with it, did not address the

change in placement.  The Court therefore does not construe the
Hearings Officer's ruling on the 6/23/09 IEP to be a ruling on
appropriateness of the change in placement.  For the reasons
stated *supra* Section I.A., this Court declines to rule on the
issue whether the change in Student K.'s placement for the 2009-
2010 violated the IDEA and REMANDS this issue to the Hearings
Officer.

> **C.**   **Mental Health Services**

Defendant also argues that this Court cannot consider
any argument based on Student K.'s alleged mental health needs
because Plaintiffs' RIH did not raise the lack of sufficient
mental health services.  This Court agrees that Plaintiffs' RIH
did not raise an issue regarding mental health services.  The
Hearings Officer therefore could not consider the issue.  See 20
U.S.C. § 1415(f)(3)(B) ("The party requesting the due process
hearing shall not be allowed to raise issues at the due process
hearing that were not raised in the notice filed under subsection
(b)(7), unless the other party agrees otherwise."); see also Haw.
Admin. R. § 8-60-65(d) (same).  This Court therefore CONCLUDES
that the mental health services issue is not properly before this
Court, and this Court will not address that issue in the first
instance.

> **D.**   **Educational History Prior to Statute of Limitations**

Plaintiffs acknowledge that they can only recover for

actions that the DOE undertook, or failed to undertake, during the limitations period, *i.e.* within two years prior to the July 15, 2009 filing of the RIH.  [Opening Br. at 33-34.] Plaintiffs, however, argue that the Hearings Officer erred in failing to consider events outside of the statute of limitations period "to provide an appropriate 'context' to determine liability for the period beginning 7/15/07."  [Id. at 34 (citation omitted).]

The Decisions's findings of fact begin with Student K.'s evaluation by the DOH in 2004, before her first birthday. The Hearings Officer discussed: Student K.'s early intervention program with IMUA; her eligibility for special education and related services beginning in the 2006-2007 school year; her diagnosis by a private psychologist as of October 13, 2006 and January 30, 2007; the psychologist's recommendations; an occupational therapy evaluation Plaintiffs obtained on April 5, 2007 and its accompanying recommendations; and a physical therapy evaluation Plaintiffs obtained on May 31, 2007 and its accompanying recommendations.  [Decision at 6-7.]  The Hearings Officer considered these prior events in evaluating the services that Student K. received during the limitations period.  For example, the Hearings Officer stated:

> The private evaluations obtained by Parents
> provided essential information needed by the Team
> to develop Student's educational programs. . . .
> For example, the 10/13/06-1/13/07 psychological

> evaluation recommends maximum levels of speech
> therapy, use of other communication mechanisms,
> use of a 1:1 aide, consultation with an autism
> specialist to develop the IEP, occupational and
> physical therapy consultation and intervention to
> build fine and gross motor skills.  Respondent
> included all of these recommendations into
> Student's program. . . .

[Id. at 20.]  Plaintiffs themselves argue that the Hearings

Officer evaluated Student K.'s progress over a three-year period,

i.e. 2006-2007 and the contested years of 2007-2008 and 2008-

2009.  [Opening Br. at 52-54.]  The Court therefore FINDS that

the Hearings Officer appropriately considered events before the

statute of limitations period as part of the context of the

events at issue in this case.

### E.   Characterization of Student K.'s SIBS

Plaintiffs argue that the Hearings Officer erred in

concluding that "Student K.'s maladaptive, SIBS (crying, dropping

to the floor, head banging), were 'emergent attempts at

communication.'"  Plaintiffs emphasize that witnesses "from both

parties concur that said behaviors evidenced Student K.'s

frustration with her inability to communicate."  [Id. at 41

(citation omitted).]

The Court agrees with Defendant that it is unclear what

portion of the Hearings Officer's conclusions of law Plaintiffs

refer to in this argument.  [Answering Br. at 18.]  The findings

of fact acknowledged that Student K. had "aggressive or self-

injurious behaviors".  [Decision at 16.]  Further, in the

54

conclusions of law, the Hearings Officer stated:

> The DOE evaluation noted Student's severe speech and communication deficits, but also stated that Student's basic developmental skills were emerging, she communicated by various non-verbal means (vocalizing, smiling, gestures, directing/pulling on an adult's hand to show them what she wants, protesting, cooperating, signing with approximate American Sign Language signs, and using PECS), and she displayed a definite interest and intent to communicate.

[Id. at 19-20.]  Thus, the Hearings Officer was clearly aware that Student K. wanted to communicate, but she still had severe deficits in her ability to do so.  To the extent that the Hearings Officer did consider Student K.'s SIBS as attempts to communicate, Plaintiffs merely disagree with the Hearings Officer's characterization.  That disagreement alone does not mean the Hearings Officer's characterization was reversible error.  Cf. Struble v. Fallbrook Union High Sch. Dist., No. 07cv2328-LAB (CAB), 2011 WL 291217, at *5 (S.D. Cal. Jan. 27, 2011) ("Differences of opinion are common in this type of case, and the fact that the ALJ could have reached a different outcome doesn't show her evaluation of the testimony was careless." (citation omitted)).  Even if this Court were to find that the characterization of the SIBS was error, Plaintiffs have not established that the error warrants reversal of the Decision because Plaintiffs have not established that the error calls in to question the Hearings Officer's conclusions of law regarding Student K.'s speech and communication program.  [Decision at 21

55

("Student's program provides her with opportunities to learn and practice communication throughout the school day . . . ."); id. at 23 ("The IEP goals for speech and communication adequately addressed Student's needs.").]

It is understandable that Plaintiffs' emphasis and concern in this issue is on the fact that Student K. injured herself out of frustration when she was unable to communicate. In the Court's view, however, the Hearings Officer's characterization of the SIBS as attempts to communicate was fair. Those actions, while unfortunately injuring Student K. in the process, did communicate the fact that Student K. wanted something, that she tried to express the want to another person, and that she was upset because the other person either did not understand her want or simply did not comply. Thus, this Court rejects Plaintiffs' argument that Hearings Officer committed clear error or plain error in characterizing Student K.'s SIBS as emerging attempts to communicate.

## II.  <u>Failure to Evaluate Suspected Autism</u>

Plaintiffs next argue that the DOE's failure to initially evaluate Student K. "in all areas of suspected disability" was a procedural denial of a FAPE pursuant to 20 U.S.C. § 1414(a)(1)(A), (b)(3)(B).  [Opening Br. at 42.]

Section 1414 states, in pertinent part:

(a)  Evaluations, parental consent, and reevaluations

56

> (1)  Initial evaluations
>      (A)  In general
>           A State educational agency, other
>      State agency, or local educational
>      agency shall conduct a full and
>      individual initial evaluation in
>      accordance with this paragraph and
>      subsection (b), before the initial
>      provision of special education and
>      related services to a child with a
>      disability under this subchapter.
>      . . . .
> (b) Evaluation procedures
>      . . . .
>      (3) Additional requirements
>           Each local educational agency shall
>      ensure that--
>           . . . .
>           (B)  the child is assessed in all areas
>           of suspected disability[.]

Plaintiffs argue that Defendant's "failure to obtain a timely
initial comprehensive autism evaluation was fatal to the
development and delivery of FAPES (sic) to Student K. since
liability attached on 7/15/07."  [Opening Br. at 42.]  Plaintiffs
emphasize that Defendant had notice of a potential autism
diagnosis as early as July 2006.  [Id. (citing ROA, Pets.' Exh.
71 at 1061-62; Pets.' Exh. 35).]

        During the proceedings before the Hearings Officer,
Mother testified that, when Student K. entered the DOE program in
the 2006-2007 school year, the DOE told Mother that it was not
going to evaluate Student K. because it was going to rely on the
information provided by DOH, which had been coordinating Student
K.'s services until that point.  [ROA, 2/11/10 Hrg. Trans. (Vol.
II) at 356.]  Mother also testified that, before leaving the DOH

57

program, DOH sent Student K. to a psychologist, Heather

Wittenberg, Psy.D., who diagnosed Student K. with PDD-NOS[7].  [Id.

at 359.]  As noted in the Decision, PDD-NOS is an autism spectrum

disorder ("ASD").  [Decision at 6.]  Specifically, Dr. Wittenberg

opined:

> the most reasonable explanation for [Student K.'s]
> problems are certainly in the direction of Autism.
> I would hesitate to assign an absolute diagnosis
> of Autism at this time, however, I would certainly
> assign a diagnosis of Pervasive Developmental
> Delay, not otherwise specified, and recommend a
> very rigorous intervention approach, the likes of
> which are usually assigned to autistic children,
> in order to further refine our diagnosis.

[ROA, Pets.' Exh. 71 (Behavioral Consultation report) at 01061.]

Insofar as the DOH referred Student K. to

Dr. Wittenberg for evaluation, [id. at 01057,] and the DOE relied

on DOH's information in determining Student K. eligible for

special education and related services, [ROA, 2/11/10 Hrg. Trans.

(Vol. II) at 356,] the DOE had notice of the potential autism

diagnosis.  The issue whether the DOE conducted the required

initial evaluation in connection with Student K.'s entry into the

DOE system is beyond the statute of limitations period.  The

issue currently before this Court is whether there was a

comprehensive evaluation in all areas of suspected disability

prior to the period at issue.  The DOE's Answering Brief does not

---

[7] Dr. Wittenberg's report dated for a July 31, 2006 visit is
in the ROA as Petitioners' Exhibit 71.

point to any evidence of a comprehensive evaluation.  The DOE

argues only that: 1) in 2009, the DOE conducted speech/language

and physical therapy evaluations in a timely manner after Parents

gave their consent; and 2) the UCLA Evaluation does not

constitute evidence that the DOE failed to appropriately examine

Student K. because it did not provide any new information about

her needs.  [Answering Br. at 19-20.]

     Mother testified that, in August 2007, she asked the

DOE to evaluate Student K.  The Student Services Coordinator

("SSC") asked Mother to sign a consent form for a reevaluation of

Student K.  Mother protested that Student K. had never been

evaluated in the first place and therefore she could not be

reevaluated, but Mother agreed to a timeline for the

reevaluation.  The timeline was completed by the November 2, 2007

IEP.  [ROA, 2/11/10 Hrg. Trans. (Vol. II) at 378-89.]  The DOE's

Evaluation Summary Report was provided to Parents on November 2,

2007.  [ROA, Resp.'s Exh. 16.]  It states that Student K. "was

referred for evaluation to provide the school team with current

data across developmental domains to assist with program

planning." [Id. at KP 068.]  The report contained summaries' of

the DOE's findings in the following areas: cognitive skills;

adaptive behavior; fine motor skills; gross motor skills; student

observation; pre-academic skills; and speech/language skills.

[Id. at KP 068-69.]  The report concluded by stating that Student

K. continued to be eligible for services "under the IDEA category

of Developmental Delay (ages 3-5)."  [Id. at KP 070.]  The DOE

also provided the reports that the summary was based upon.  [ROA,

Resp.'s Exh. 9 (IED-II Standardized Scoring Report); id., Exh. 10

(Batteile Developmental Inventory - Cognitive Domain); id., Exh.

11 (Speech/Language/Hearing Evaluation); id., Exh. 12 (Student

Observation); id., Exh. 13 (Pre-Academic Skills Assessment); id.,

Exh. 14 (Adaptive Behavior Assessment); id., Exh. 15 (Summary

Form - Preschool Outcomes Measurement System).]

     These evaluations, while addressing a wide spectrum of

Student K.'s areas of functioning, did not specifically address

the suspected autism diagnosis.  For example, the Batteile

Development Inventory includes a worksheet for developmental

delay.  The worksheet is an on-line DOE form, [ROA, Resp.'s Exh.

10 at KP 051,] and it raises the question whether a worksheet for

ASD could have applied, but not considered.  The Adaptive

Behavior Assessment as based on the Adaptive Behavior Assessment

System - Second Edition ("ABAS-2"), which is "a standardized

measurement of life skills, communication and socialization."

[Id., Exh. 14 at KP 062.]  In contrast, the measures administered

for the UCLA Evaluation included autism-specific assessments: the

Autism Diagnostic Interview - Revised (ADI-R); and the Autism

Diagnostic Observation Schedule (ADOS) - Module I.[8]  [ROA, Pets.'
Exh. 35 at 00559.]

The DOE issued a PWN on July 2, 2009 stating that
Student K. "will receive a reevaluation consisting of an
assessment of social communication, emotional regulation,
transactional support, and pre-academic skills[,]" as well as a
physical therapy assessment.  [ROA, Resp.'s Exh. 76 at KP 526.]
The Decision notes that the DOE completed Student K.'s cognitive
assessment on July 2 and 22, 2009, her physical therapy
assessment on July 22 and 31, 2009, and her speech language
therapy assessment on July 24, 2009.  [Decision at 12.]  This
reevaluation, however, is not relevant to the issue whether the
DOE denied Student K. a FAPE by failing to evaluate her in all
areas of suspected disability because the DOE did not conduct
these assessments until after the formulation of the IEPs
currently before this Court.[9]

---

[8] The Court does not suggest that the DOE was required to
conduct an evaluation equivalent to the UCLA Evaluation.  The
Court merely cites the UCLA Evaluation because it lists some
examples of autism-specific assessments that the DOE could have
utilized to evaluate that area of suspected disability.

[9] This Court therefore will not consider Plaintiffs'
arguments that: the Hearings Officer committed clear error and/or
plain error in concluding that the DOE timely completed the 2009
evaluations once Parents gave their consent; or that the Hearings
Officer erred in allowing the DOE to substitute the 2009
evaluations for the UCLA Evaluation.  [Opening Br. at 45-47.]  To
the extent that Plaintiffs argue that the Hearings Officer erred
in concluding that Student K.'s IEP team considered and
(continued...)

Having considered the parties' arguments and the evidence in the ROA, this Court finds that the DOE did not evaluate Student K. in all areas of suspected disability prior to the time period in question.  This failure was a procedural violation of the IDEA.  The FAPE inquiry does not end there because this district court has recognized that "[a] school district's failure to assess in all areas of suspected disability may constitute a procedural denial of a FAPE." J.S. v. Dep't of Educ., Hawai`i, Civ. No. 10-00022 DAE-LEK, 2010 WL 3384911, at *6 (D. Hawai`i Aug. 19, 2010) (citing Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025, 1031-33 (9th Cir. 2006)).  This district court, however, has also recognized that:

> While the IDEA guarantees certain procedural safeguards for children and parents, the Ninth Circuit has recognized that not every procedural violation results in denial of a FAPE.  See L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 909 (9th Cir. 2009) ("Procedural flaws in the IEP process do not always amount to the denial of a FAPE.").  Procedural flaws in the IEP process only deny a child a FAPE when the flaws affect the "substantive rights" of the parent or child.  Id. Such substantive rights include the loss of a child's educational opportunity or an infringement on the parents' opportunity to participate in the IEP process.  Id.

B.T. ex rel. M.T. v. Dep't of Educ., Hawaii, Civil No. 10-00456

---

[9](...continued)
implemented the recommendations from the UCLA Evaluation into Student K.'s program, [id. at 47-50,] this Court will consider this argument as part of Plaintiffs' argument that the contested IEPs denied Student K. a FAPE.

SOM/RLP, 2011 WL 1833206, at *3 (D. Hawai`i May 11, 2011).

Plaintiffs essentially argue that the procedural violation of failing to conduct a comprehensive evaluation of all areas of suspected disability, in particular the suspected autism diagnosis, resulted in a loss of educational opportunities for Student K.[10]  During the 2007-2008 and 2008-2009 school year, Student K. was eligible for special education and related services under the category of developmental delay (ages 3-5). [Decision at 8-9.]

Developmental delay is a distinct eligibility category from ASD.  Haw. Admin. R. § 8-60-39(d)(1) states:

> A student, aged three through five, shall be
> eligible for any eligibility category in this
> subchapter if the applicable criteria are met, or
> for the category of developmental delay if, as
> measured by appropriate diagnostic instruments and
> procedures, one or more of the following is met:
>> (A) Cognitive development and adaptive
>> behavior are delayed equivalent to one and
>> one-half standard deviations below the mean
>> when compared with the standard score
>> expected for the chronological age.
>> (B) One of the following areas is delayed one
>> and one-half standard deviations below a
>> standard score for:
>>> (i) Motor development, including fine
>>> motor, gross motor, sensory motor, and
>>> perceptual-motor development;
>>> (ii) Communication, including speech and
>>> language development;
>>> (iii) Academic development;

---

[10] There is no indication in the record that Parents were deprived of the opportunity to participate in the IEP development process.  In fact, they have consistently been an active, vital, and well-informed part of Student K.'s IEP team.

                        (iv) Adaptive behavior;

Haw. Admin. R. § 8-60-39(a) states, in pertinent part:

            (1) Autism spectrum disorder.  A student shall be
            eligible under the category of autism spectrum
            disorder if the student has a developmental
            disability significantly affecting verbal and
            nonverbal communication and social interaction,
            generally evident before age three, that adversely
            affects the student's educational performance.
            The student may have one or more of the following
            other characteristics often associated with autism
            spectrum disorder:
                  (A) Engagement in repetitive activities and
                  stereotyped movements;
                  (B) Resistance to environmental change or
                  change in daily routines;
                  (C) Unusual responses to sensory experiences.
            (2) A student who manifests the characteristics of
            autism spectrum disorder after age three may be
            diagnosed as having autism spectrum disorder if
            the criteria in paragraph (1) are satisfied.

On July 2, 2009, after considering the UCLA Evaluation, Student

K.'s eligibility team determined that she was eligible for

services under the category of multiple disability - autism.

[Decision at 12 & n.17.]

        Plaintiffs acknowledge that many children can

legitimately be characterized under multiple areas of eligibility

and that it is possible to develop an appropriate IEP for a

student who arguably is in the wrong category.  [Id. at 22-23.]

Thus, the issue is whether the DOE's failure to evaluate Student

K. in all areas of suspected disability, in particular autism,

resulted in the loss of educational opportunity.  Other courts

have recognized that "while the school district and experts may

                              64

disagree over the diagnosis of a student's disability, '[t]he IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the child's] multiple disabilities.'"  <u>Klein Indep. Sch. Dist. v. Hovem</u>, 745 F. Supp. 2d 700, 708 (S.D. Tex. 2010) (citing <u>Heather S. v. Wisconsin</u>, 125 F.3d 1045, 1055 (7th Cir. 1997)); <u>see also, e.g.,</u> <u>D.B. ex rel. C.B. v. Houston Independent Sch. Dist.,</u> No. Civ. A. H-06-354, 2007 WL 2947443, at *10 (S.D. Tex. Sept. 29, 2007) ("Failure to identify (or agree with) a particular disorder is not a per se denial of a FAPE as long as individualized services are being provided.").  In this Court's view, there would have been a loss of educational opportunity where the DOE failed to address Student K.'s autism needs.

Each of the four IEPs before this Court states that Student K. would be provided with an autism consultant/autism consulting teacher for 240 minutes per month.  [ROA, Pets.' Exh. 14 (4/8/08 IEP) at 00253; Pets.' Exh. 12 (9/8/08 IEP) at 00202; Resp.'s Exh. 69 (5/18/09 IEP) at KP 479; Pets.' Exh. 7 (6/23/09 IEP) at 00084.]  Sandrina Redfearn testified she worked as Student K.'s ACT from fall 2008 until sometime in summer 2009.[11]

_____

[11] The Court could not readily determine from the record who was Student K.'s ACT prior to Ms. Redfearn.  To the extent that Plaintiffs argue the DOE's failure to evaluate Student K.'s potential autism diagnosis denied her a FAPE because it resulted in a loss of educational opportunity, it is Plaintiffs' burden to prove the loss of educational opportunity.  If the DOE failed to
(continued...)

[ROA, 5/6/10 Hrg. Trans. (Vol. V) at 1041.]   Ms. Redfearn described her educational background as: "a bachelor's degree in early childhood and elementary education, a certification in Montessori education, a certification in brain injury, recertification in special education, and a master's degree in special education, severe and profound disabilities, autism specialist."[12]   [Id. at 1031.]   The DOE offered Ms. Redfearn as an expert in educational programing for autistic students, and Plaintiffs did not object.   The Hearings Officer allowed her to so testify.  [Id. at 1036-38.]

Ms. Redfearn testified as follows about the nature of the consultation services she provided for Student K.: "It was primarily consult to the team at large.  I participated in team meetings and IEP meetings.  I provided coaching in relationship-based strategies to the paraprofessionals and teachers.  I consulted with the teacher and the service providers about programs."  [Id. at 1038-39.]  She consulted with Student K.'s teachers and paraprofessionals "[a]t least weekly."  [Id. at 1039.]

---

[11](...continued)
provide Student K. with an ACT prior to fall 2008, the Court would consider that as part of the analysis of whether there was a loss of educational opportunity.  Plaintiffs, however, have not directed the Court to any evidence in the ROA that the DOE failed to provide Student K. with an ACT prior to fall 2008.

[12] Ms. Redfearn completed her master's degree in spring 2009.  [ROA, 5/6/10 Hrg. Trans. (Vol. V) at 1031.]

The 4/8/08 IEP did not include a behavioral analyst or specialist as one of the services provided, but a BISS was present at the team meeting.  [ROA, Pets.' Exh. 14 (4/8/08 IEP) at 00253, 00255.]  Mother also testified that Student K. was given a BISS for the 2007-2008 year after the November 2007 IEP.  [ROA, 2/11/10 Hrg. Trans. (Vol. II) at 385.]  The other three IEPs currently at issue provided for a behavioral specialist or a behavioral analyst for twenty hours per month, and the BISS attended two of those team meeting.  [ROA, Pets.' Exh. 12 (9/8/08 IEP) at 00202, 00205; Resp.'s Exh. 69 (5/18/09 IEP) at KP 479, KP 482; Pets.' Exh. 7 (6/23/09 IEP) at 00084, 00087.]  Rachel Huckfeldt testified that she served as Student K.'s BISS from January 2009 until the summer of 2009.  [ROA, 5/6/10 Hrg. Trans. (Vol. V) at 893.]  Ms. Huckfeldt has a master's degree in behavioral analysis and is a board certified behavior analyst.  [Id. at 884-85.]  During her master's program, her area of emphasis was autism and ABA.  [Id. at 888.]  The DOE offered Ms. Huckfeldt as an expert in ABA programming, and Plaintiffs did not object.  The Hearings Officer allowed her to so testify.  [Id. at 892.]

Ms. Huckfeldt testified as follows about the nature of the services she provided while she was Student K.'s BISS:

> I supervised the two paraprofessionals that worked with her, and I provided consultation to the other professionals on the case, the teacher, the speech and language (sic), the occupational

67

> therapist, about including behavioral strategies kind of throughout her day and . . . work[ed] on identifying the functions of her problem behavior, making sure that the behavior support plan was effective and meaningful, developing ABA programming to teach some discrete target skills, things like that.

[Id. at 894.]

Prior to becoming Student K.'s BISS, Ms. Huckfeldt supervised Student K.'s BISS, first Holly Smiley, and then Tracy Ruggiero.  [Id. at 893; ROA, Pets.' Exh. 12 (9/8/08 IEP) at 00205.]  Ms. Huckfeldt testified that BISSes generally

> collaborate primarily with the IEP team and the teachers in identifying the needs of the individual with autism, and then from there we figure out how best to address those needs.  And it can be training the teacher, it can be training the direct staff, it can be coming in and actually doing assessments with the student.  It just really depends on what the individual person requires at that time.

[ROA, 5/6/10 Hrg. Trans. (Vol. V) at 886-87.]  Mother testified that Ms. Ruggiero had a background in ABA and, in the February 2008 IEP team meeting, Ms. Ruggiero suggested that the team write more ABA goals in Student K.'s IEP and implement more ABA strategies in her day.  [ROA, 2/11/10 Hrg. Trans. (Vol. II) at 385-86.]  Ms. Ruggiero's suggestions, however, were not implemented at that time.  [Id. at 393.]  Mother also testified that Ms. Ruggiero implemented thirty minutes per day of the DTT time by training Student K.'s one-to-one adult support provider. [Id. at 394-95.]

68

The Court notes that the Present Levels of Educational Performance ("PLEP") in the 9/8/08 IEP stated, in the area of behavioral/sensory regulation needs, "[s]low skill acquisition rate requires intensive 1-1 instructional support (progress noted with discrete trial instructional format)".  [ROA, Pets.' Exh. 12 (9/8/08 IEP) at 00191.]  The May 13, 2009 PLEP, which are noted in both the 5/18/09 IEP and the 6/23/09 IEP, noted "[o]verall behavior improved with structured ABA instructional program". [ROA, Resp.'s Exh. 69 (5/18/09 IEP) at KP 463, KP 465; Pets.' Exh. 7 (6/23/09 IEP) at 00072, 00074.]

Having individually reviewed each of the four IEPs currently at issue, as well as other evidence in the ROA, this Court finds that the IEPs currently before this Court did address Student K.'s autism related needs.  There is no evidence in any of the four IEPs that the failure to evaluate Student K. in all areas of suspected disability resulted in the loss of educational opportunity.  The Court therefore CONCLUDES that the failure to evaluate Student K. in all areas of suspected disability did not result in the denial of a FAPE.

## III. <u>Whether the Contested IEPs, as Written, Offered a FAPE</u>

Plaintiffs next argue that the contested IEPs did not offer Student K. a FAPE because: they failed to provide her a "basic floor" from which to access her education; Student K.'s teachers and other providers were not sufficiently trained in ABA

strategies to properly implement them in her program; and the IEP team did not consider and adopt the recommendations in the UCLA Evaluation.  Plaintiffs emphasize that, during the period at issue, Student K. did not make any significant progress. Similarly, Plaintiffs argue that, because Student K. did not progress, this proves that the Kamali`i pre-school placement in general was not appropriate for Student K. because she was unable to participate in any meaningful way.

The Hearings Officer found, by a preponderance of the evidence, that the DOE provided Student K. "with an intensive autism-specific program, primarily consisting of ABA strategies that met her unique needs and was reasonably calculated to allow Student to receive educational benefit."  [Decision at 26.]  The Hearings Officer also concluded that the four contested IEPs, each of which provided

> a program in the fully self-contained pre-school classroom with pull-out services for speech and occupational therapy, consultive services for physical therapy, 1:1 adult support personnel, interaction with special education pre-school peers and typically developing peers, BISS services, ACT services, parent education and training, weekly team meetings, and other accommodations - **was offered in the least restrictive environment and appropriate for her unique needs.**

[Decision at 26-27 (emphasis added).]  The Court agrees with the Hearings Officer.

70

First, the Court rejects Plaintiffs' argument that the
Hearings Officer erred because she failed to individually analyze
each of the four contested IEPs.  [Opening Br. at 52-54.]
Although there is some variation in the number of minutes of
services that the IEPs specified for particular services, and
there are some additional components in the later IEPs, the key
components of the four contested IEPs, as noted by the Hearings
Officer, are the same.  Thus, while an analysis of each IEP might
have been more clear, the Court concludes that the Hearings
Officer did not commit reversible error by analyzing Student K.'s
IEPs as a whole.  The Court emphasizes that it expresses no
opinion about whether the Hearings Officer's format of the
analysis would constitute reversible error were there were
substantial variations in the components of the IEPs at issue.

As to Plaintiffs' argument that Student K.'s teachers
and other providers were not sufficiently trained in ABA
strategies to implement them in her program, this Court has
already discussed the autism-specific qualifications of Student
K.'s ACT and her BISSes.  See *supra* DISCUSSION Section II.
Arthur Bein was Student K.'s special education teacher at the
time of all of the IEPs currently at issue before this Court.
[ROA, Pets.' Exh. 14 (4/8/08 IEP) at 00255; Pets.' Exh. 12
(9/8/08 IEP) at 00205; Resp.'s Exh. 69 (5/18/09 IEP) at KP 482;
Pets.' Exh. 7 (6/23/09 IEP) at 00087; 3/23/10 Hrg. Trans. (Vol.

III) at 539.]  He testified that he had a bachelor's degree in
early childhood education, with a specialty in special education
for early childhood, *i.e.* birth to third grade.  At the time of
the hearing, he was two classes away from his master's degree in
special education.  Under the No Child Left Behind
classification, he has a highly qualified teacher status for
special education from pre-kindergarten to third grade.  [Id. at
536-37.]  In the course of his employment with the DOE, Mr. Bein
received training provided by the autism consulting team
regarding "[t]echniques and strategies for children with autism
and different aspects of methodology from ABA, DTT to Floortime
to just different strategies/techniques used in either special
education classrooms, resource rooms or a typical inclusion
classroom."  [Id. at 538.]  The Court therefore finds that
Plaintiffs have failed to meet their burden to establish that
Student K.'s teachers and providers lacked the qualifications and
training necessary to carry out her program.

         The Court understands that Plaintiffs would have liked
more services and more individualized attention, such as
recommended in the UCLA Evaluation and such as Student K.
received at PAC.  An IEP, however, need not conform to a parent's
wishes in order to be sufficient or appropriate.  See Shaw v.
District of Columbia, 238 F. Supp. 2d 127, 139 (D.D.C. 2002)
(stating that the IDEA does not provide for an "education . . .

designed according to the parent's desires" (citation omitted)).

The Court notes that a FAPE need not provide the "absolutely best" or "potential-maximizing" education. <u>J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.</u>, 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted).  The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit."  <u>Id.</u> at 433 (citations and quotation marks omitted).  Having reviewed the IEPs currently before this Court, the Court agrees with the Hearings Officer that the DOE's offers of a FAPE relating to Student K.'s programs and placement in the 4/8/08 IEP, the 9/8/08 IEP, the 5/18/09 IEP, and the 6/23/09 IEP, as written, were designed to allow Student K. to achieve meaningful educational gains in the least restrictive environment.  The Court is sympathetic to Parents' view that PAC allowed Student K. to make remarkable progress, and the Court realizes that Parents' are frustrated and disappointed that she did not progress as much as they wanted her to while she was at Kamali`i.  The IDEA, however, does not require States to "maximize each child's potential commensurate with the opportunity provided other children," but only to "enable the child to receive educational benefits."  <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 198, 207 (1982) (footnote omitted).

The Court notes that, throughout the proceedings, Parents have sought, as all good parents do, to secure the best services for their child.  Student K.'s progress at PAC is commendable, but the role of the district court in IDEA appeals is not to determine whether an educational agency offered the best services available.  Further, while the parties appear divided by honest differences of opinion about the progress that Student K. made while at Kamali`i, the Court finds compelling evidence that the DOE constructed an individualized program tailored to meet Student K.'s autism-specific needs.  Based on the preponderance of the evidence, the Court therefore CONCLUDES that the four IEPs currently before this Court offered Student K. a FAPE in compliance with the IDEA.

## IV.   Implementation of the IEPs

Plaintiffs also argue that the DOE denied Student K. a FAPE by failing to properly implement the IEPs currently at issue.  Specifically, Plaintiffs argue that: the DOE's data collection system was inadequate to track Student K.'s progress; the DOE failed to implement ASL in Student K.'s program, even though her 7/8/08 IEP called for it; and the DOE failed to implement pointing in Student K.'s program, even though her 8/10/07 IEP called for it.  [Opening Br. at 56-62.]

A.    **Data Collection**

Plaintiffs argue that the DOE failed to implement Student K.'s IEPs for the 2007-2008 school year because it failed to implement an adequate data collection system to track Student K.'s progress toward her goals.  Plaintiffs contend that this material failure to implement her IEPs denied Student K. a FAPE. [Opening Br. at 56-57.]  Plaintiffs point to Mr. Bein's testimony that there was no data collected on Student K.'s targets during that period and that the assessment of her progress was observational and anecdotal.  [Id. at 57 (citing ROA, Vol. III, p. 637, L. 6 to p. 638, L. 1).]  Student K.'s 4/8/08 IEP states that each annual goal will be measured through either: observation; daily work; observation and records.  [ROA, Pets.' Exh. 14 at 00242-52.]  Plaintiffs have therefore failed to establish that the assessment of Student K.'s progress through observation and anecdotal evidence constituted a failure to implement Student K.'s 4/8/08 IEP.

To the extent Plaintiffs argue that the observational and anecdotal assessment was inadequate and that the DOE should have collected other data, Plaintiffs have not identified any legal authority supporting their position that assessment of progress toward goals through observation and anecdotal evidence is insufficient.  Although, in Plaintiffs' view, there were other preferable methods of assessment, this Court cannot find that the

75

DOE denied Student K. a FAPE because it did not provide the "absolutely best" or "potential-maximizing" education.  See J.W., 626 F.3d at 439 (citation and internal quotation marks omitted).  Plaintiffs have not presented any evidence or legal authority that observational and anecdotal assessment is required to provide a "basic floor of opportunity" or a "meaningful benefit."  See id. at 439, 433 (citations and quotation marks omitted).  The Court therefore CONCLUDES that Plaintiffs have not carried their burden of establishing that the manner in which the DOE assessed Student K.'s progress for the 2007-2008 school year violated the IDEA.

### B.   **ASL**

Plaintiffs emphasize that both the November 8, 2007 PWN and the February 15, 2008 PWN stated that sign language would be used in Student K.'s classroom.  [ROA, Pets.' Exh. 15 (2/15/08 PWN) at 277 ("A multi-model approach will be used in the classroom (words, pictures, signs)."); Pets.' Exh. 16 (11/8/07 PWN) at 299 (similar).]  This is repeated in the 4/9/08 PWN.  [ROA, Resp.'s Exh. 27 at KP 155.]  Plaintiffs argue that the DOE's failure to provide personnel trained in ASL, or to replace the objective in the IEPs for the 2007-2008 school year was "another material failure to implement Student K.'s IEP denying her FAPE."  [Opening Br. at 57-58.]  At the oral argument, Plaintiffs' counsel emphasized that PECS is not a language.

76

Plaintiffs apparently contend that the DOE should have provided personnel that could have taught Student K. to use ASL as her primary means of communication.

Student K.'s IEPs, however, called for signs to be used **in combination with** other methods of communication, including PECS. The PLEP section of the 4/8/08 IEP confirms that multiple methods of communication were being implemented:

> [Student K.'s] speech sound imitations have been more evident when eating, but sounds have primarily been the prolonged /m/ and "mum or mama." Oral-motor imitation before a mirror or face to face has not been very productive. She has used a minimal amount of picture exchange. She definitely knows and can pick out and extend the pictures of "cookie, bubble, ball, music, Row Your Boat." More food and drink items will be included. Signs have also been attempted, but they have been limited to "more, please, done," but with assistance. . . .

[ROA, Pets.' Exh. 14 (4/8/08 IEP) at 00237.] The PLEP from the 4/8/08 IEP also contains notes from May 29, 2007, stating that Student K. was "using PECS to communicate and [was] doing well. . . . She is signing, but seems that she wants you to sign for her or hands and fingers aren't strong enough to sign them." [Id. at 00238.] The notes from November 2, 2007 state that Student K. "communicates by using various non-verbal means (e.g., vocalizing, smiling, gesturing, directing/pulling, protesting, cooperating, signing, and exchanging pictures)." [Id. at 00239.]

The Court also notes that, for the August 10, 2007 IEP meeting, Parents prepared a document and shared it with Student

77

K.'s IEP team, [ROA, Pets.' Exh. 70 at 01050-56,] "as a way to participate and to help them understand specifically what her needs were and where we thought she needed help." [ROA, 2/11/10 Hrg. Trans. (Vol. II) at 367.] It states: "Sharon[ Yamamoto, DOE Speech Language Pathologist,] has done a wonderful job starting [Student K.] in the PECS system." [ROA, Pets.' Exh. 70 at 01050.] Further, Parents wrote: "[Student K.] does do some signs but mostly when prompted. She responds best when we sign simple signs to her such as more, please, eat, no, juice, brush teeth, and all pau. . . . **We have decided to discontinue teaching new signs, use existing signs, and move forward with PECS.**" [Id. at 01051 (emphasis added).] Further, Mother testified that, at about that time, Student K.'s private occupational therapist, Kiegan Blake, [ROA, 2/11/10 Hrg. Trans. (Vol. II) at 215,] "at her first evaluation, encouraged [Parents] to stick with PECS rather than signing" [id. at 367]. The subsequent IEPs indicate that Student K. continued to use multiple methods of communication, including use the familiar signs:

> [Student K.] is non-verbal and has no words at
> this time. She does make a growing variety of
> sounds with different intonation. Some sounds are
> used in the same situations, and can be matched to
> her emotions.
> . . . .
> Emerging use of PECS to request food/juice,
> preferred activities . . . .
> Knows/ uses (sic) signs for "all pau", "more",
> "brush teeth", "bath time", "bathroom", "eat",
> "please" "help"[.]
> Understands the meaning of "yes"; her ability to

> appropriately gesture "yes" and "no" is
> emerging[.]

[ROA, Pets.' Exh. 7 (6/23/2009 IEP) at 00072 (PLEP Revised by 5/13/09).]

In light of the foregoing, the Court cannot find that there was a failure to implement the 4/8/08 IEP regarding the use of ASL.  Although Plaintiffs may now, in hindsight, believe that it would have been better for the IEP team to focus on ASL rather than on PECS, this Court must focus on what was reasonable at the time the IEP was implemented.  Cf. Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999) ("Actions of the school systems cannot . . . be judged exclusively in hindsight. . . .  [A]n . . . [IEP] is a snapshot, not a retrospective.  In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." (quoting Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1041 (3d Cir. 1993)) (some alterations in Adams)).  The Court therefore CONCLUDES, based on its consideration of the 4/8/08 IEP, that the manner in which the DOE implemented ASL in Student K.'s program did not violate the IDEA.

## C.   **Pointing**

Plaintiffs also argue that the DOE failed to implement the benchmark from the 8/10/07 IEP that Student K. would learn to point to certain body parts.  [ROA, Pets.' Exh. 19 (8/10/07 IEP)

at 00358.]  This objective is also included in the 4/8/08 IEP.

It states that Student K. "when asked by adult (sic), will point

to the following body parts a) mouth, eyes, nose, feet b) hair,

tongue, head, ears with 3/3 trials over 2 data days."  [ROA,

Pet.'s Exh. 14 at 00243.]  Plaintiffs argue that the DOE failed

to implement this benchmark because Student K.'s "teacher,

behavior specialist and speech therapist refused to teach her

pointing because it would create a 'rude and demanding child.'"

[Opening Br. at 59-60 (quoting RA, Vol. III, p. 631, L. 7 to p.

632, L. 13).]

Plaintiffs refer to Mr. Bein's hearing testimony, but

his statements must be considered in context.

> Q.  . . .  [Student K.] couldn't point when
> she first started at Kamalii; correct?
> A.  Point to the pictures?
> Q.  Point to anything.
> A.  No.
> Q.  And, in fact, you discouraged her from
> pointing?
> A.  Correct.
> Q.  That's because, as you explained to
> [Mother], **a child would become demanding if they
> learned how to point**?
> A.  Correct.  Well, pointing is so
> objective, too.  **I could point to anything in this
> room and, really, you couldn't isolate what I was
> pointing at.**  Whereas icon of a picture or
> communicating exactly what they need, then they
> have a way of communicating.  **Also in an
> environment pointing is kind of rude.**  If you kind
> of find somebody really pointing at you
> subjectively and the facial expressions, you can
> take it as I'm going to harm you or you can take
> it unfriendly.  Whereas, again, if you use other
> methods; it will be more warming, it will be kind

of more communication, peers will kind of read it
as inviting.
    Q.  Did you discuss with any behavioral
specialist that you were discouraging pointing
with [Student K.] as a method of communicating?
    . . . .
    A.  Yeah.
    Q.  Who did you discuss that with?
    A.  The behavioral specialist and the speech
therapist.  We really wanted her to focus on using
pictures instead of pointing.  **We would still
honor a point**, but we would redirect to the PECS
book or we would reinforce using a picture icon.

[ROA, 3/23/10 Hrg. Trans. (Vol. III) at 631-32 (emphases added).]

        Mr. Bein's testimony does not prove that the DOE failed

to implement the benchmark from Student K.'s IEP that she learn

to identify certain body parts by pointing to them.  Mr. Bein's

testimony indicated only that her providers tried to redirect

Student K. away from relying on pointing as a method of

communication.  He did, however, also state that Student K.'s

providers would honor Student K.'s attempts to communicate by

pointing.

        Further, Plaintiffs emphasize that Student K. did not

understand pointing as of January 30, 2007 and that she still

could not point when she entered PAC.  [Opening Br. at 60-61

(quoting Pet. Ex. "47", p. 627; ROA, Vol. I, p. 128, L. 5-13; p.

129, L. 22 to p. 130, L. 2).]  Plaintiffs apparently argue that

the DOE easily could have taught Student K. pointing because she

learned the concept in one session at PAC.  [Id. at 62 (quoting

ROA, Vol. I, p. 193, L. 11-20.).]  Plaintiffs, however, have not

81

identified any objectives or other portions of Student K.'s IEPs stating that Student K. would be taught pointing as a form of communication.  Even assuming *arguendo* that the DOE failed to teach Student K. pointing as a form of communication, Plaintiffs have not established that this constituted a failure to implement Student K.'s IEPs.

The Court also notes that Student K.'s IEPs indicate that she had a greater ability to point than Plaintiffs' Opening Brief suggests.  The PLEP for the 4/8/08 IEP states that Student K. "has started to point to objects, but needs prompting."  [ROA, Pets.' Exh. 14 at 00237.]  The PLEP for both the 9/8/08 IEP and the 6/23/09 IEP state that she could "get, give, point".  [ROA, Pets.' Exh. 12 (9/8/08 IEP) at 00189; Pets.' Exh. 7 (6/23/09 IEP) at 00072.]

Having considered the record as a whole, this Court rejects Plaintiffs' arguments that the DOE's failure to teach Student K. pointing constituted a failure to implement the IEPs currently before this Court.  The Court also rejects Plaintiffs' argument that the alleged failure to teach pointing constituted a denial of a FAPE.

In summary, the Court CONCLUDES that Plaintiffs have not carried their burden of proving that the DOE denied Student K. a FAPE, either in the formulation or the implementation of the 4/8/08 IEP, the 9/8/08 IEP, the 5/18/09 IEP, or the 6/23/09 IEP.

82

**V.     Reimbursement of Placement at PAC**

Finally, Plaintiffs seek reimbursement for private school tuition and related expenses.  [Opening Br. at 66-70.] Under 34 C.F.R. § 300.148(c), reimbursement for private school expenditures is available

> [i]f the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private preschool, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate.

Parents who unilaterally transfer a child from a public school to a private school usually do so "at their own financial risk."  Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2496 (2009) (citations and internal quotation marks omitted).  Because Plaintiffs did not prove that the four IEPs currently before this Court denied Student K. a FAPE, the Court FINDS that Plaintiffs are not entitled to reimbursement for educational and related expenses Plaintiffs incurred while Student K. attended PAC.  The Court therefore DENIES Plaintiffs' request for reimbursement. The Court emphasizes that its ruling on Plaintiffs' request for reimbursement is based only on the Court's consideration of the 4/8/08 IEP, the 9/8/08 IEP, the 5/18/09 IEP, and the 6/23/09 IEP. The Court expresses no opinion regarding what remedy Plaintiffs

would be entitled to if, on remand, the Hearings Officer determines that any of Student K.'s other IEPs denied her a FAPE.

## CONCLUSION

On the basis of the foregoing, the Hearings Officer's Findings of Fact, Conclusions of Law and Decision, filed September 3, 2010, is HEREBY AFFIRMED IN PART AND REMANDED IN PART. The Court AFFIRMS the Hearings Officer's Decision to the extent that it: rejected Plaintiffs' argument that the DOE failed to properly evaluate Student K.; and concludes that Plaintiffs failed to carry their burden of proof as to their FAPE claims based on Student K.'s 4/8/08 IEP, 9/8/08 IEP, 5/18/09 IEP, and 6/23/09 IEP. The Court, however, CONCLUDES that the Hearings Officer erred in failing to rule upon Plaintiffs' claims based on the other IEPs and PWNs that Plaintiffs challenged in the RIH. The Court therefore REMANDS this case to the Hearings Officer for consideration of Plaintiffs' claims as to the remaining IEPs and PWNs.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, October 31, 2011.



\_/S/ Leslie E. Kobayashi_____
Leslie E. Kobayashi
United States District Judge

**AARON P., ET AL. V. DEPARTMENT OF EDUCATION, STATE OF HAWAII;
CIVIL NO. 10-00574 LEK-KSC; ORDER AFFIRMING IN PART AND REMANDING
IN PART THE HEARINGS OFFICER'S SEPTEMBER 3, 2010 DECISION**